[Crim. No. 8388. Second Dist., Div. One. July 15, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. FRANCIS EDGAR BALLARD, Defendant and Appellant.

Jerome Weber for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, Herbert Davis, Deputy Attorney General, William B. McKesson, District Attorney, Harry Wood and Robert J. Lord, Deputy District Attorneys, for Plaintiff and Respondent.

FOURT, J.—This is an appeal from a judgment of conviction on two counts of illegal abortion.

In an indictment returned by the grand jury of Los Angeles County on April 11, 1961, the appellant was charged with the crime of violation of section 274, Penal Code, in seven counts.

Count I charged in effect that defendant did on February 11, 1961, "provide, supply, use and employ an instrument and other means upon the person of Marie Owen . . . with . . . the intent . . . to procure the miscarriage of said Marie Owen, said use and employment of said instrument and other means to procure said miscarriage of said victim, not then and there being necessary to preserve the life of . . . Marie Owen."

Count II charged in the language above stated that the defendant did on February 4, 1961, perform an abortion upon Dorothy M. Franzen.

It is unnecessary to set forth the charges contained in the remaining counts for the defendant was found not guilty

thereof—there being no evidence that any crime had been committed as so charged in said counts.

The defendant pleaded not guilty and the trial was set for November 15, 1961, and later continued to December 11, 1961, and after subsequent continuances (due to congestion of the calendar) the trial commenced on January 12, 1962, before a jury. Marie Owen Fitch testified for the prosecution on January 12, 1962. On January 16, 1962, Dorothy Franzen testified for the prosecution and Marie Owen Fitch was recalled and testified further on direct examination.

A motion for a mistrial made by the defendant was granted. On February 20, 1962, the cause proceeded to trial again, this time without a jury. Marie Owen Fitch and Dorothy Franzen each testified over objection as is more particularly hereinafter set forth. The defendant was found guilty as to Counts I and II and not guilty as to Counts III, IV, V, VI and VII. A motion for a new trial was made and denied. Notice of appeal was duly filed.

At the start of the trial the judge took judicial notice of the case of *People* v. *Ballard,* 167 Cal.App.2d 803 [335 P.2d 204], and the prosecution read into the record excerpts from that opinion with reference to the background and qualifications of the defendant.[1]

Marie Owen Fitch was called as the first witness. She testified that sometime before February 11, 1961 (she did not recollect exactly when it was, although she apparently believed it was in the early part of February), she believed herself to be pregnant. She stated that she was then in good health and desired to terminate the pregnancy. She lived in an abode with her two children, apparently by a previous marriage. Her testimony was that she did not go to any doctor or clinic immediately after she believed herself to be pregnant. She saw the defendant at his office, without a previous appointment having been made, sometime during the week preceding

---

[1] "The defendant is a medical doctor. . . . He received his bachelor's degree from the University of Washington, graduated from the medical school at Stanford University, worked for one and one-half years in the Department of Obstetrics and Gynecology at Stanford, went to Harvard University for a year on a scholarship and received a master's degree. He was appointed as a medical officer for the California State Department of Health. He has been employed as a Divisional Director of the Los Angeles City Health Department. During World War II he served as a doctor in Walter Reed Hospital and was in charge of a hospital in Africa. He taught at the University of California and also at the University of California at Los Angeles. He has delivered hundreds of babies and has written many articles for various magazines and newspapers."

February 11, 1961. Roger and Dorothy Franzen went with her to the doctor's office. She explained to the doctor that she "had taken some pills, turpentine pills" and she was feeling "rather ill" and asked the doctor if he could help her and he said "yes." Her symptoms were that of bleeding, being "very nauseous" and having "horrible headaches" all of the time. She also told the doctor that she had been taking nine to twelve turpentine pills a day although the box which contained the pills had written thereon "Three a day." That after she had taken the turpentine pills she started to pass blood and tissue. She further told the doctor that she was passing tissue and he stated that the chances were that the foetus would never grow any further and that a miscarriage had already started, and further that if the condition was not taken care of right away an infection would set in and she needed treatment and without such treatment that she might very well die. The witness stated at the trial that she also felt at the time of her visit to the doctor that she might well die if she was not cared for at a very early date. The doctor indicated to her that the turpentine pills were very dangerous and that she should never have taken them. She also indicated to the doctor that she wanted him to do whatever "his practice would dictate" under the circumstances. She did not recollect that he used any such words as "scrape" or "curettement." No physical examination was made of the witness at the doctor's office. After the discussion with the doctor at his office an arrangement was made to meet the doctor on the following Saturday at Mr. Fitch's apartment in North Hollywood. The reason for choosing the apartment was that she had her two children with her at her house and that she could not go to a hospital because she did not "want any embarrassment"—the possible embarrassment apparently arising from the fact that she was an unmarried person, had engaged in sexual intercourse, had become pregnant and had suffered a miscarriage. Since the episode in question she married Mr. Fitch and has given birth to a child by him. The apartment of Fitch was difficult to locate and an arrangement was made for the doctor to be picked up by Fitch and taken to his abode on Saturday, February 11, 1961. Fitch picked up the witness at her house and took her to his apartment. Later the same day Roger and Dorothy Franzen arrived at the Fitch apartment. Fitch and Mr. Franzen left the Fitch apartment and picked up the doctor and the three of them returned to the apartment. The doctor

gave the witness "a shot." Fitch and Mr. Franzen left the apartment. Mrs. Franzen stayed with the witness and the doctor. The apartment was fairly small, with a separate bathroom, living room and open bar kitchen. The doctor examined the witness upon a couch which had been prepared for such examination. She stated that she felt something inside her but she could not describe what it was other than to say that there was considerable pain. She saw no instrument and could not state that she felt any instrument inside her. She was then asked "What did you feel when something went inside of you besides pain?" and she answered, "Well, that is all." Upon her so testifying the prosecution, without any foundation or showing of surprise or other statement to the court, then directed the attention of the witness to a page and line of what purported to be the record of her testimony before the grand jury. The deputy district attorney then said:

"Did you say this before the Grand Jury?

" 'Well, I just felt some—an instrument go in me and some scraping.' "

"Did you say that before the Grand Jury?"

The witness related that if such were "down" she must have said it but that she did not "remember what I said at the Grand Jury." She then said that she testified truthfully before the grand jury as she then remembered the facts. The witness was given no opportunity to refresh her recollection and to testify from her own recollection. There was an objection to the evidence upon the grounds that the prosecutor was attempting to impeach his own witness. The court upon request of the prosecutor took judicial notice of the fact that the witness had so answered the questions before the grand jury and permitted the introduction of such evidence as past recollection recorded under the provisions of section 2047, Code of Civil Procedure. She further stated that she did not know whether "anything was removed from inside" her.

Before Fitch left the apartment earlier the witness saw some money change hands from Fitch to the doctor. She indicated that an amount of $500 was discussed with the doctor but she could not recollect just where such discussion took place. The prosecutor without any foundation or any other statement then said:

"Q. Well, I direct your attention to your testimony before

the Grand Jury, page 12, line 19. Were you asked this question, and did you give this answer''

'' . . . . . . . . . .

'' 'Q. When did you discuss the money with Dr. Ballard?
'' 'A. At his office.'

''Were you asked that question before the Grand Jury, and did you give that answer?''

She answered that she supposed she did so answer ''if it is down there''—that she was telling the truth as she remembered it when testifying before the grand jury—but that the transcript reference of the grand jury proceedings did not refresh her recollection in any respect. Apparently the evidence was received as ''past recollection recorded.'' Fitch paid to the doctor the sum of $500. Shortly before the doctor left the apartment he gave the witness some pills to take.

On February 13, 1961, the witness had a discussion with members of the police department with reference to what had been done. When asked on the witness stand what she had told the police she answered, ''They told me,'' and she further stated that she did not agree with the police in what they apparently stated had taken place. The witness learned after the conversation with the police that the doctor had been arrested.

The witness explained that her testimony to the effect that she was in good health referred to a time prior to the occasion of her consuming the turpentine pills—that she was not in good health after she took the pills—that after taking the pills and after the bleeding and passing of the tissue started she had intense headaches, that she was virtually going out of her mind. She advised the doctor of these and other facts as heretofore set forth and he told her that she had partially aborted herself. She also stated that it was her opinion that she had aborted herself prior to seeing or talking with the doctor. The doctor advised at the time of her visit to his office that she discontinue the taking of the turpentine pills but she continued to take them in spite of the advice. The witness further stated that it was her opinion that what the doctor did was necessary to save her life.

The court, in ruling on a matter of past recollection recorded, similar in nature to the situation as heretofore set forth, said:

''. . . I think that all of the facts should be brought out for the Court to make a proper determination . . . I think the only thing that can reasonably be done in order to elicit

all of the facts so the Court will have all of the facts to determine whether or not the witnesses are both telling the truth and whether or not all of the testimony comes out as they now remember it, is to have their present testimony, and if it is in conflict with testimony previously given, to allow them to read the previous testimony, try and refresh the recollection of the witness and determine whether or not the recollection has been refreshed, and what the present testimony is.

"Irrespective of how many possible or *alleged inconsistencies there may be, all of them will have to be brought out. In fact, that is the desire of Mr. Finnerty.*" (Italics added.)

Dorothy Franzen testified that she was present at the Fitch apartment on February 11, 1961, when the doctor and Marie Owen were present, and also that she was present with Marie Owen at the visit to the doctor's office. She had seen the doctor at her apartment about a week before that. At the time she saw the doctor in her apartment she did not believe that she was pregnant although some two or three weeks before that she was pregnant and at that previous time she had desired to terminate her pregnancy. She was in good health at the time she first desired to terminate the pregnancy; however, this was before she contacted the doctor. She and her husband went to see the doctor after she had taken some medication, turpentine pills and had used some lysol and soap which had caused a miscarriage. She described to the doctor that her husband had found her lying in a coma on her bed, that she had been bleeding and passing tissue—that she had repeatedly taken overdoses of the turpentine pills—that the Lysol and soap treatment had been extremely painful, that she was very sick and that she had to be treated. The doctor took a blood test and the report from the laboratory came back to the effect that the test was "positive." She stated unequivocally that when she and her husband talked to the doctor at his office the pregnancy was terminated and she was then making arrangements for the doctor to remove the remaining parts of the tissue.

The prosecutor, without any foundation or statement to the court of the purpose of the examination of the witness said:

"Did you say this before the Grand Jury (Reading):

" 'A. . . . So then, he took a blood test, sent it to the lab, and it came back positive. So then, we made arrangements for him to perform a curettement.

" 'Q. When you say, "positive" did that indicate to you that you were still pregnant?

" 'A. Yes, uh huh.

"Q. All right. And you made arrangements for him to terminate that pregnancy?

" 'A. Yes.'

"Were you asked those questions before the Grand Jury, and did you give those answers?"

The witness answered that she did not remember being asked the questions and did not remember giving the answers.

An objection was made upon the grounds that an effort was being made by the prosecution to impeach his own witness. The prosecutor contended that the testimony was proper. The prosecutor then asked the witness if she had testified before the grand jury and she answered in the affirmative. The inquiry was then made as to whether she had testified truthfully before the grand jury as to the facts as she then remembered them and her reply was that she could not "truthfully say that I answered truthfully at the Grand Jury." She related at the trial that she was so terrified when she appeared before the grand jury that she could not remember a thing—that she did not know what questions had been asked nor what answers she had given. The witness recollected that at the visit to the doctor a fee of $350 was discussed, and that she did not remember any talk about why the amount was so fixed. The prosecutor then proceeded to badger the witness about what she had stated to the grand jury upon the subject matter. When counsel for the doctor objected the court stated in effect by way of explanation that the case was not being tried before a jury and therefore it made little difference what the prosecutor said. Without any foundation or statement of purpose the prosecutor then stated:

"Did you say this before the Grand Jury . . .

" 'A. We decided how much it would be, or he told me how much it would be.

" 'Q. What did he tell you?

" 'A. It would be $350.

" Q'. Now, did he mention why it was this amount of money?

" 'A. Yes.

" 'Q. What did he say?

" 'A. Because I had known him before.'

"Were you asked those questions, and did you give those answers before the Grand Jury?"

She answered at the trial that she did not remember being asked the questions or giving the answers as related. The judge immediately ruled: "It will be received as past recollection recorded." The prosecutor then continued to importune the witness with reference to the same subject matter.

The witness in her testimony told about the doctor coming to her apartment, giving her a shot, going into the bedroom and removing the remaining tissue from the miscarriage. She said that she could not feel what was inside her, however that she did experience considerable pain. When the doctor was finished he gave her another shot and some pills. She saw nothing removed from her. The procedure which was taken was accomplished at the apartment of the witness because had it been done at the doctor's office it would have been necessary for her to be driven home in an automobile, and it was simply easier to be at home.

On cross-examination counsel for the doctor attempted to refer the witness to her testimony before the grand jury and she stated again in effect that she did not know what questions had there been asked or what answers had been given.

The judge questioned the witness at considerable length about previous miscarriages (some of which were 10 or more years ago), when such had occurred, what attention had been provided her and whether she had been in a hospital. She was also asked what she had discussed with the doctor and whether the doctor had given her any medication for infection during the interim between the time of her visit at his office and the time of the performance of the work in question at the apartment. To the last question she answered in the negative. The witness was excused from further attendance. A short recess was had. Counsel for the defendant then asked to put Mrs. Franzen back on the witness stand and she stated in answer to questions by defense counsel that the doctor had given her some liquid, the name of which she did not know but which sounded like aureomycin, and indicated that it might "clear itself out by itself." The witness was then put to answering several more questions by the judge as to what the liquid was, where she got it, why she had not told him about it before and she responded by indicating that during the recess counsel for the doctor had referred to a record showing, in effect, that she had been given some medication and it had refreshed her recollection.

The next witness was one of the arresting officers and he told of the making of the arrest about 7 p.m. on February

13, 1961, without a search warrant. His testimony was solely for the purpose of establishing probable cause for the arrest and not to establish the fact of commission of any crime. He recited in effect that the officers knew of the previous conviction of the doctor and the reversal—that they had two anonymous phone calls in the summer of 1960 which were to the effect that the doctor was ''going like a house afire.'' Also they were told by a so-called confidential source about February 4, 1961, that Marie Owen was going to be aborted at Fitch's apartment on February 11, 1961. They had the doctor's office under surveillance and observed him on the way to and arriving at Fitch's apartment and thereafter leaving.

He further testified that on Monday, February 13, 1961, at about 1:20 p.m. the officers interviewed Marie Owen and that she told them what had occurred, relating that she had taken turpentine pills—had gone to Mrs. Franzen for help and that the Franzens had taken her to the doctor on or about February 6, 1961. Further that Mrs. Owen had told the officers who was responsible for the pregnancy, that Fitch wanted to get married but that she had said no to the proposal. Telephone checks were made through the telephone company of the doctor's calls.

The officer related that at about 7 p.m. the police saw the defendant walk from a side door of his house toward his automobile, which was parked in the driveway. The officers ''were outside of a steel chain link fence on the sidewalk.'' They called to the doctor and asked if they might talk to him—he walked toward the officers—it was dark—the doctor was asked to open the gate and he did so. The officers then arrested him (apparently on the public sidewalk outside of his property) and then entered the house. No consent or permission was given to enter or search the house, the officers were asked repeatedly if they had a search warrant, and not having any they answered in the negative, saying at times ''we don't need one.'' The doctor was asked for the key to the door to a room and did not produce it forthwith; the officers thereupon took the hinges off of the door and made a forced entry. The doctor was then directed to open his safe and he at first refused. The officers then discussed blowing it up if he would not open it whereupon the doctor opened the safe and the officers took his books, records and documents therefrom.

The search was conducted according to the prosecutor to

secure corroborating evidence of the alleged abortions as set forth in Counts I and II *and also for whatever else they could find out about any other alleged abortions.* The doctor's records were received in evidence over objections.

The judge upon his own motion then recalled Dorothy Franzen to the witness stand for a limited purpose because of ''one or two questions'' which were as he said ''in his mind unanswered.'' The reporter's transcript shows that 10 pages of transcript were used in these questions and answers. The witness was questioned as to the type of apartment Fitch had, the couch, bathroom, etc., as to who fixed the couch, whether or not the sheets were clean, the exact position of Marie Owen on the couch, the time limitations involved and what she was doing while the doctor was with Marie Owen, and whether she said ''goodbye'' to the doctor. The prosecutor was then permitted under the guise of redirect examination to inquire *as to where she at a previous time had a curettement performed in a hospital and how the fee for such compared with the defendant's fee.* She answered over objection that she was in the county hospital at the time and was on county aid.

A police officer from the homicide division who participated in the arrest of the doctor and the search of his house ostensibly qualified as an expert and testified that the records of the doctor, some of which were in cryptic form, indicated that the doctor had had some association or dealing with D. Franzen and Marie Owen. The records seemed to show the telephone numbers of the patients and entries which the officer took to mean in effect that the doctor had performed certain services on certain days and had charged certain amounts therefor. *An objection was made to the introduction of the evidence.* Counsel cited *Mapp* v. *Ohio,* 367 U.S. 643 [81 S.Ct. 1684, 6 L.Ed.2d 1081] and *Agnello* v. *U.S.,* 269 U.S. 20 [46 S.Ct. 4, 70 L.Ed. 145, 51 A.L.R. 409], as authorities for his position. The records were admitted into evidence. The police officer was also permitted to testify as an expert that a legitimate physician would on the average perform a curettement for $75. The prosecution then rested its case. The defendant elected not to testify and did not put on any witness.

The judge heard argument and then verbalized his views of the matter. He indicated a concern over whether there was evidence by the prosecution to establish that the operations were not necessary to save or preserve the life of the women involved. He then purported to analyze the testi-

mony of the two women witnesses. Referring to Mrs. Fitch he stated that she was hostile and nervous, that she was evasive in her answers to the prosecutor's questions, and that when taken on cross-examination, to the leading questions, she was positive and seemed to have headaches and was nervous as was the lady who was involved in the previous *People* v. *Ballard* case. The judge then recited that although the prosecution was bound by the testimony of its own witnesses he could and would believe and disbelieve some parts of the testimony of each of the women witnesses. With reference to the bleeding and passing of tissue the judge stated that no part of that evidence was elicited on direct examination—that it all came in on cross-examination. The reporter's transcript demonstrates that the judge was wrong in this connection for in each instance the prosecutor was told that each woman had taken turpentine pills, was bleeding, was "nauseous," was passing tissue and was very sick. Furthermore, the prosecutor undoubtedly could have secured a more detailed statement from each of the witnesses had he asked such questions.

The judge wondered repeatedly why the doctor had not taken his patients to a hospital—stating in effect that when he, the judge, had surgery performed he went to the hospital —the judge also commented on the fact that at a hospital there would be a board which would determine whether an abortion might be therapeutic—that in this case whatever the doctor did was done in an apartment, and that he, the judge, did not know whether the sheets were clean, or whether the instruments (and there was no testimony that there were any instruments) were sterile. Great importance was laid upon the fact that the doctor's charges were apparently large. The judge expressed the view that he did not think that what was done was necessary to preserve the life of either woman and pointed out in effect that the defendant had not testified that the procedure was necessary to preserve life.

The judge then pointed up that there was nothing in the evidence to show that either procedure was an emergency and that therefore there was time to have done what was done in a hospital. He then attempted to distinguish this case from the former *Ballard* case by pointing up that in the former case the "abortion" was performed in the doctor's office, where more sterile and sanitary conditions prevailed (although there was no testimony to this effect) and that here the doctor did not take the witness stand and testify in his

own behalf and that here there was mention of the fees received and in the former case there was no mention of the fees. This was an incorrect statement for there were many mentions of the fees in the former case.

With reference to Mrs. Franzen the judge stated that he just did not believe her with reference to her illness and that he did believe that of which she said which would be damaging to the doctor.

The judge then found the defendant guilty as to Counts I and II and not guilty as to the remaining counts.

Appellant now asserts: (1) that the evidence is insufficient as a matter of law to sustain the judgment, (2) that the corroboration is insufficient, (3) that the trial court erred in permitting the prosecutor in effect to impeach his own witness, (4) that the court erred in admitting over objections certain writings and (5) that the written exhibits should not have been received in evidence because they were obtained as the result of an unlawful search and seizure.

■ In this case it is clear that the elements of the offense of abortion have not been established. It was ascertained from the two women who testified that at the time each of the women went to the doctor they were not pregnant, that each of them had had a miscarriage and each was in a bad state of health because of self-imposed abortive practices. There is no evidence to the effect that the doctor thought or believed either or both of the women to be pregnant. In fact the evidence is to the exact contrary. There was no evidence direct or indirect or otherwise to the effect that the women or either of them was in good health at the time either of them went to the doctor. (*People* v. *Ballard*, 167 Cal.App.2d 803 [335 P.2d 204].)

Furthermore, even if it be assumed that the doctor did perform an abortion upon each or either of the women named there is not a word of evidence in the record to the effect that such was not reasonably necessary to save the life of such woman. The testimony is undisputed in the case of each woman that she was in a dangerous health condition at the time the doctor performed whatever was done. (See *People* v. *Gallardo*, 41 Cal.2d 57, 62 [257 P.2d 29]; *People* v. *Ballard*, 167 Cal.App.2d 803, 813 [335 P.2d 204]; 23 So.Cal. L.Rev. 523; 31 So.Cal. L.Rev. 193.)

■ There is nothing in the record to the effect that the doctor did not proceed in accordance with professional recognized and approved methods. The burden of proof is on

the prosecution to establish the lack of necessity for the operation or procedure as an element in its case.

It will be remembered that a police witness said that they knew in advance that the doctor was going to commit an abortion on Mrs. Fitch; that the officers followed the doctor to the apartment, the officers took pictures of the cars arriving and leaving, yet they made no arrangements to have Mrs. Fitch examined by a competent physician at or close to the time of the alleged abortion or at any other time to the end, and in view, of being able to establish by competent evidence that the procedure followed by the defendant doctor was not necessary under the circumstances to save the life of such persons.

With reference to the comments of the judge that the women should have been taken to a hospital, there is nothing in the law presently which requires any doctor to take his patients under circumstances as here evidenced to a hospital and there is no legal requirement with which we are advised that a doctor submit the matter of what he thinks should be done to a board of perhaps antagonistic colleagues. See 11 Stanford Law Review 417 for a discussion of a proposal for a new law with reference to the subject matter. See also American Law Institute's Model Penal Code.

 Considering the matter of the receipt of excerpts from the purported grand jury transcript as past recollections recorded, it must be kept in mind there was no showing made by the prosecution that either of the women witnesses needed the aid of the grand jury transcript to refresh their recollection. In fact the converse is true, namely that the witnesses seemed to remember what was said and done between them and the doctor. Apparently each of the women testified at length in the trial which was declared a mistrial without any necessity of proceeding as the prosecution did in this case. There was no showing that the transcript used by the prosecution was a true and accurate recital of what questions were asked and what answers were given by the grand jury. As far as the record in this case indicates the grand jury transcript was not authenticated in any respect, there was no verification by any witness at the time of trial as to its correctness and there was no stipulation to that effect.

 The judge in effect stated in discussing the matter during the trial that the prosecutor should be given great liberality in *impeaching the witnesses*. Evidence of impeachment however under the circumstances is not affirmative evi-

dence of the commission of any crime. ■ We are cognizant of the fact that it is extremely difficult to lay down rules which will cover each and every situation, but in the circumstances of this case the reference to and inclusion of such references as referred to in the grand jury transcript into the record of this case as past recollection recorded, when at most they were impeachment references, constitutes prejudicial error.

■ It has been properly said that ''it is almost universally held that the prior inconsistent statement of the 'turncoat witness' is admissible only for purposes of impeachment. It is not 'substantive' or 'affirmative' evidence sufficient to make a case for the jury or sustain a verdict or finding . . .'' (Witkin on Cal. Evidence, § 662, p. 701). In other words, disbelief in some of the testimony of each of the two women does not produce anything affirmative by way of proving that the defendant was guilty beyond a reasonable doubt as charged.

In the case of Mrs. Franzen she stated in effect that she not only did not remember such statements as were supposedly recited in the grand jury transcript but that if such statements were there she could not say that such statements were the truth. In other words, there was no establishment of the trustworthiness of the transcript—if anything was established it was that the grand jury transcript was untrustworthy.

There is a clear distinction between ''past recollection recorded'' and ''refreshing memory'' or impeachment. No useful purpose would be served in setting forth in detail such distinction. However, see 3 U.C.L.A. Law Review 616-635, 28 Iowa Law Review 531, 18 Oregon Law Review 136, for extensive and learned discussions of the matter.

The contention that the records in the doctor's office were secured by the police as a result of an unlawful search and seizure and therefore that such records should not have been admitted into evidence is not particularly important (in the determination of this case) in the light of what we have already determined. This case, however, does point up the abuse which can be made of permitting a search and seizure as an incident to a lawful arrest. The Penal Code provides in detail (Pen. Code, §§ 1523-1542) what is necessary to secure a search warrant, and the warrant upon issuance contains limitations as to what can be done under it. The facts here demonstrate that an officer may avoid the making of a show-

ing of probable cause required for the issuance of a search warrant if he is given the option of making a valid seizure on less evidence by simply avoiding the judicial process entirely. A valid arrest on the street ought not to give an officer complete authority to rummage about in the house of a suspect on a general fishing expedition to see what he can find. In other words the police here quite apparently avoided an ample opportunity to secure a search warrant (under the Penal Code provisions) to the end that they could search the doctor's premises without a warrant and thereby go farther and do more by way of search than they could have had they secured a search warrant. See 49 California Law Review 478 and following.

In this case the officers were not searching for any instrumentality of the alleged crimes nor were they looking for anything which might be forfeited to the state as contraband. There was no thought that the doctor was a dangerous person or that he might make any effort to escape. This case comes dangerously close to what has occurred in some countries other than ours with a different philosophy and has sometimes been described as ''the sudden unjustified 'knock on the door'.'' Under the circumstances however as they appear in this particular case it is unnecessary to make any determination with reference to defendant's contention of the unlawful search and seizure.

The judgment is reversed.

Wood, P. J., and Lillie, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied September 11, 1963.