[Crim. No. 4699.   Third Dist.   Jan. 27, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. JOHNNY
PIERCE, SR., Defendant and Appellant.

Baird B. McKnight, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, Gordon F. Bowley and Jack R. Winkler, Deputy Attorneys General, for Plaintiff and Respondent.

FRIEDMAN, J.—Defendant appeals from the judgment after a jury found him guilty of violating Penal Code section 288. Essentially, the charge was sexual misconduct between defendant and L, his 13-year-old stepdaughter, and T, his 10-year-old stepson, on the night of November 6, 1966. The two children testified that on that night defendant had sexual relations with L and forced her into acts of oral copulation with him and T.

L testified that defendant had indulged in sexual relations with her for several years. N, the 18-year-old sister of L, no longer living in the home, testified that defendant had engaged in sexual relations, including oral activity, with her when she was 11 years old and for several years thereafter. Defendant charges in very general terms that this evidence was irrelevant and "inflammatory."

There was no defense objection to the testimony of prior sexual misconduct, hence the evidentiary claim will not be entertained on appeal. (Witkin, Cal. Evidence (2d ed.) § 1285.) Defendant's trial counsel was apparently satisfied (and quite properly so) that L's description of similar misconduct was admissible under such cases as *People* v. *Kelley*,

66 Cal.2d 232 [57 Cal.Rptr. 363, 424 P.2d 947], and *People* v. *Sylvia,* 54 Cal.2d 115 [4 Cal.Rptr. 509, 351 P.2d 781]; that her sister's narration of a similar pattern of activity was admissible under such cases as *People* v. *Covert,* 249 Cal.App. 2d 81 [57 Cal.Rptr. 220].[1]

Defendant's reliance upon *People* v. *Stanley,* 67 Cal.2d 812 [63 Cal.Rptr. 825, 433 P.2d 913], is misplaced. There the defendant was charged with misbehavior with two boys and convicted solely on the testimony of one of them, who testified to other offenses practiced upon both. The boy's testimony of the other offenses was uncorroborated and added nothing to his credibility. Thus its prejudicial effect outweighed its probative value. In this case both victims testified under circumstances in which the credibility of each was challenged. Each corroborated the other and each was corroborated by the testimony of their elder sister. In this case the evidence of prior misbehavior had high probative value.

The trial was featured by evidence of defendant's aggressive and violent behavior toward other members of the family. Another feature was evidence concerning the shooting of Ruda Pierce (wife of defendant and mother of L and T) earlier in the evening of the offense. A little after 8 p.m. Mrs. Pierce suffered a seemingly accidental gunshot wound while handing defendant a pistol she had just cleaned. Police arrived about 8:30 p.m. and took her to the hospital. About 9:30 p.m. defendant's brother, Art Pierce, arrived, together with his wife Carrie and five children. Also present was Mrs. Easley, defendant's mother, who lived in the household. The Art Pierce family stayed the whole night in defendant's house.

The trial theory of the defense was twofold: (1) Defendant was bedridden because of a spinal operation approximately five weeks earlier, had a heavily taped back, had to use a bedpan and was physically incapable of being the active partner in sexual intercourse. (2) Although defendant had in his room the hospital bed which he occupied and the double bed ordinarily occupied by his wife, he was alone in his room on the night of the offense, the double bed was empty and both L and T slept in their own room with some of Art Pierce's children. An orthopedic surgeon confirmed the back operation

---

[1]We mention only a few specimen decisions antedating defendant's trial, which occurred in May 1967. A later decision indicating admissibility of the elder sister's testimony is *People* v. *Cramer,* 67 Cal.2d 126 [60 Cal.Rptr. 230, 429 P.2d 582].

and expressed the opinion that sexual intercourse would have caused back pain and muscle spasm. Defendant denied sexual activities with L, T and their elder sister and testified that the two children had not occupied the bed in his room on the night in question.

According to their testimony Art and his wife remained up all night. One of them would enter defendant's bedroom from time to time during the night to see if he needed anything and each time found him alone. There were two bedrooms in the house, one occupied ordinarily by defendant and Ruda, the other occupied by the children. There was a connecting bathroom between the two bedrooms.

■ L, the prosecuting witness, and N, her elder sister, testified that defendant drank heavily, beat and threatened members of his family. Defendant now assigns this evidence as error. The evidence was relevant to support the witnesses' testimony that defendant had forced them to submit to his sexual demands. This claim of error represents nothing more than a disagreement between defendant's appeal counsel and his trial counsel. The latter did not object to this admissible evidence and it cannot be challenged on appeal.

Defendant's mother Mrs. Easley, his brother Art, sister-in-law Carrie, and the latters' 14-year-old daughter Alice, were defense witnesses. All testified on direct examination to their presence in the house on the night of November 6. Each testified that L and T had slept in their own room with the Art Pierce children, that defendant had been in his own bed all night and had not gotten up. None of these witnesses testified on direct examination to defendant's general behavior, violent or otherwise. In cross-examining these witnesses, the deputy district attorney was permitted, over objection, to ask whether each had later made certain statements to investigating police officers. Each witness denied having told the officers that defendant was habitually violent, had become enraged on the night of November 6, had arisen from bed and chased his mother through the house, had hurled a knife which stuck in a door and had threatened to knife anyone who left.

Having elicited these denials on cross-examination, the prosecutor called two police officers as rebuttal witnesses. These officers testified that they had interviewed the members of the Pierce family as a result of a child molestation complaint against defendant. One officer, Sergeant Stark, testified that Art and Carrie Pierce had told him that on the night in question defendant had threatened his mother with a hunting

knife, chased her through the house, threw the knife (which stuck in a door), had ordered no one to leave the house; that at other times defendant had made sexual advances to their daughter Alice; that L had complained to them of sexual advances by defendant. Sergeant Stark stated that Art Pierce had told them of defendant's frequent violent behavior and had expressed fear of him.

Sergeant Stark and a woman police investigator, Officer Cracraft, had interviewed Alice Pierce, the daughter of Art and Carrie. These officers now testified to extrajudicial revelations which, on cross-examination, Alice had denied making. According to the officers Alice had told them of sexual advances toward herself by defendant; had told of L's complaints to her of sexual molestation; had related that during the night in question L had asked her to come into her bed in the same room as defendant, because she was afraid of defendant; that while Alice was in defendant's bedroom with L, defendant had displayed his private parts and indulged in obscene remarks and gestures; that earlier that night defendant had threatened the others with a hunting knife if they attempted to leave the house.

Defendant now enumerates the transcript pages on which references to these extrajudicial statements appear, charging generally that these pages contain irrelevant ''inflammatory'' evidence. The People justify this evidence on the theory of impeachment by prior inconsistent statements and as proof of defendant's physical ability to perform the acts charged.

Although the defense had objected unsuccessfully to the foundational cross-examination in which the prosecutor had elicited the defense witnesses' denials of statements to the officers, there was no defense objection to the officers' testimony narrating the contents of these statements.[2] Thus the trial record does not reveal the theory on which the prosecution offered these statements. The prosecutor's approach supports the view that he was bent upon impeachment, eliciting on cross-examination the witnesses' denials of statements to the officers, then calling the latter to relate prior statements inconsistent with the cross-examination. ■ Under current California law, a trial court has discretionary power to permit impeachment, albeit on somewhat collateral matters extracted on cross-examination. (Evid. Code, §§ 351-352; see Law Revision Com. Comment to Evid. Code, § 780; Witkin, Cal. Evi-

[2]We shall explain, *infra*, why the claim of evidentiary error is available on appeal despite the absence of objection in the trial court.

dence (2d ed.) §§ 1224, 1259; cf. *People* v. *Burton,* 55 Cal.2d 328, 352-353 [11 Cal.Rptr. 65, 359 P.2d 433].)

An alternative theory is impeachment by evidence of the witnesses' bias in favor of the accused, their close relative. ▆ A witness may be impeached by evidence of bias. (Evid. Code, § 780, subd. (f).) "It is always proper for a party against whom a witness has given damaging testimony to show out of the mouth of the witness himself, if he can, or by other sources, if necessary, that such witness has an unusual interest in the outcome of the case. . . ." (*People* v. *Sacramento Butchers' etc. Assn.,* 12 Cal.App. 471, 494 [107 P. 712], quoted in Witkin, Cal. Evidence (2d ed.) § 1230; see also 3 Wigmore on Evidence (3d ed.) § 948 et seq.) ▆ Defense witnesses, Mrs. Easley, Art and Carrie Pierce and their daughter Alice, all close relatives of defendant, had testified that they had been in the house all night, during which time the two supposed victims of defendant's lust were in a separate bedroom. Their testimony (in effect, a denial of the charged misconduct) had hurt the prosecution. The prosecution was at liberty to show, if it could, that these were turncoat witnesses, who had changed their stories under the pressure of affection, fear or familial relationship. In eliciting the defense witnesses' denials of extrajudicial statements, the prosecution was not bringing out falsehoods on cross-examination for the purpose of destroying these falsehoods on rebuttal. Rather, it could properly demonstrate the bias which motivated the witnesses' *direct* testimony and through that means demonstrate the falsity of that testimony.

The demonstration of familial bias was especially poignant in the case of Alice, the 14-year-old cousin of the two victims. On cross-examination she had testified to sleeping in the children's bedroom all night together with L and T. Her extrajudicial statements, however, forcefully suggested a biased witness who had refashioned her courtroom testimony in a shape quite unlike that related to the investigating officers.

In terms of its impact upon the jury the officers' narration of extrajudicial statements bore not only upon the credibility of the defense witnesses but upon defendant's guilt. Viewed as substantive evidence, the officers' testimony was a recital of unsworn hearsay. At the time of defendant's trial (May 1967) such testimony was seemingly admissible under Evidence Code section 1235, which declares: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testi-

mony at the hearing and is offered in compliance with Section 770.''[3]

People v. *Johnson,* 68 Cal.2d 646 [68 Cal.Rptr. 599, 441 P.2d 111], was decided May 28, 1968, after defendant's trial and during the pendency of this appeal. *Johnson* holds that in criminal trials section 1235 cannot be constitutionally invoked for the purpose of permitting a witness' prior inconsistent statement as substantive evidence against the accused; that substantive use of such a statement deprives the accused of his Sixth Amendment right to confront and cross-examine the witness, as that right has been delineated by the federal Supreme Court in such cases as *Douglas* v. *Alabama,* 380 U.S. 415 [13 L.Ed.2d 934, 85 S.Ct. 1074]; *Pointer* v. *Texas,* 380 U.S. 400 [13 L.Ed.2d 923, 85 S.Ct. 1065], and *Bridges* v. *Wixon,* 326 U.S. 135 [89 L.Ed. 2103, 65 S.Ct. 1443]. Although *Johnson* was applied to exclude prior sworn testimony as substantive evidence in the criminal trial, its rationale applies with equal vigor to the witness's prior extrajudicial statements. (*Bridges* v. *Wixon, supra,* 326 U.S. at pp. 153-154 [89 L.Ed. at pp. 2114-2115]; *People* v. *Woodberry,* 265 Cal.App.2d 351, 360 [71 Cal.Rptr. 165]; *People* v. *Alvarez,* 268 Cal.App.2d 297, 299 [73 Cal.Rptr. 753]; *People* v. *Green,* * (Cal. App) 71 Cal.Rptr. 100; 3 Wigmore on Evidence (3d ed.) § 1018, subd. (b), fn. 3, p. 688; see *People* v. *Hopper,* 268 Cal.App.2d 774 [75 Cal.Rptr. 253].)

Defendant's trial counsel had objected to the cross-examination eliciting the defense witnesses' denial of statements to the officers, but not to the officers' narration of those statements. At the time of the trial counsel was entitled to rely upon the seeming ticket of admissibility proferred by section 1235. In view of the statutory invalidity later revealed by the *Johnson* case, the absence of objection in the trial court does not preclude defendant from resorting to the claim of inadmissible hearsay on appeal. (*People* v. *Hillery,* 62 Cal.2d 692, 711-712 [44 Cal.Rptr. 30, 401 P.2d 382]; Witkin, *op. cit.,* § 1309, cf. Evid. Code, § 353.)

Section 1235 of the Evidence Code manifests a legislative choice to permit a witness' prior inconsistent statement as substantive evidence against a party so long as the witness is in court and available for cross-examination. In this case the

---

[3] Section 770 in effect requires that the witness be given an opportunity to explain or deny the prior statement at some point in the trial.

* A hearing was granted by the Supreme Court on October 9, 1968. The final opinion of that court is reported in 70 Cal.2d [75 Cal.Rptr. 782, 451 P.2d 422].

Pierce relatives remained available and could have been recalled for the purpose of explaining or denying their statements to the police.

In *Johnson*, however, the Supreme Court rejected the witness's current availability for cross-examination as a means of probing the accuracy of his prior statement, choosing to adhere to a conventional doctrine of the law of evidence which insists upon his availability for cross-examination in the immediate context of his prior declaration. That insistence, of course, cannot possibly be fulfilled where the statement is extrajudicial. As *Johnson* recognizes, the doctrine is not one of constitutional law but a traditional rule of evidence whose abolition has been advocated by progressive authorities. (See *People* v. *Johnson, supra,* 68 Cal.2d at pp. 653-658.) The Sixth Amendment right of confrontation assures the accused an opportunity to probe the witness's accuracy.[4] At this point the needs of effective prosecution parallel and do not collide with the interests protected by the Sixth Amendment, for the prosecution too needs an effective forensic scalpel. The question is: On which occasion was the witness speaking the truth: when he made his prior statement or when he gave his courtroom testimony?

A powerful male family figure frequently appears as the

[4]This assurance has never been rigid or ritualistic. In *Kirby* v. *United States,* 174 U.S. 47, 55 [43 L.Ed. 890, 894, 19 S.Ct. 574], Mr. Justice Harlan described the essence of confrontation in these terms: ''But a fact which can be primarily established only by witnesses cannot be proved against an accused . . . except by witnesses who confront him at the trial, upon whom he can look while being tried, whom he is entitled to cross-examine, and whose testimony he may impeach in every mode authorized by the established rules governing the trial or conduct of criminal cases. . . .''

Professor Wigmore points out that at common law there was never ''an indispensable thing called Confrontation,'' but rather an indispensable right to cross-examination. (5 Wigmore on Evidence (3d ed.) § 1397, p. 128.) A number of authorities, not recent but of indisputable historical accuracy, point out that the Sixth Amendment guarantee of confrontation is designed to preserve and continue common law rights, not to broaden them or to disturb exceptions to the hearsay rule. (*Salinger* v. *United States,* 272 U.S. 542, 548 [71 L.Ed. 398, 402, 47 S.Ct. 173]; *Dowdell* v. *United States,* 221 U.S. 325, 330 [55 L.Ed. 753, 757, 31 S.Ct. ⁵901; *Kirby* v. *United States, supra,* 174 U.S. at p. 61 [43 L.Ed. at p. 896]: *Mattox* v. *United States,* 156 U.S. 237, 243 [39 L.Ed. 409, 411, 15 S.Ct. 337]; 1 Cooley, Constitutional Limitations (8th ed.) pp. 662-666; 5 Wigmore, *op. cit.,* § 1397, pp. 130-131.)

Wigmore declares that the constitutional rule of confrontation is the hearsay rule as to cross-examination ''with all the exceptions that may legitimately be found, developed, or created therein.'' (*Ibid.,* p. 131; see also Note, 82 Harv.L.Rev. 472.) Whether *People* v. *Johnson, supra,* beclouds the standard California rule permitting evidence of a nonconsenting sex victim's extrajudicial complaints, e.g., *People* v. *Burton, supra,* 55 Cal.2d 328, 351, remains to be seen.

accused in intra-family sex cases. The dominance by which he imposes his sexual desires on the weaker members also permits him to close their mouths. The pressures he uses to silence the witnesses against him are fear, familial sentiment and economic need. After the offense breaks out into open crisis, he needs time to restore his dominance. The family's initial outburst of complaint is more likely to be reliable, their later testimony apt to be subverted by time and pressure.[5] The turncoat witness is a standard syndrome of family sex offenses, one which baffles law officers and prosecutors. By rejecting present cross-examination as a means of forcing the witness to explain his past declarations and his present testimony, the *Johnson* rule enlarges on the Sixth Amendment, frustrates the prosecution's ability to cope with turncoat witnesses and prevents the jury from considering evidence of probative value and probable reliability.

In view of *Johnson,* the Pierce relatives' prior statements to the investigating officers were admissible for the narrow purpose of impeachment but not as substantive evidence of guilt. ■ According to the doctrine of multiple admissibility, evidence which is admissible for one purpose is not to be excluded even though the jury may improperly consider it for an impermissible purpose. (*People* v. *Burton, supra,* 55 Cal.2d 328, 348.) The traditional technique for confining such evidence to a permissible channel is a limiting instruction to the jury; the trial court, however, is enjoined to give the party against whom the evidence is offered such additional protection against misuse as it reasonably can. (Evid. Code, § 355; *People* v. *Sweeney,* 55 Cal.2d 27, 42-43 [9 Cal.Rptr. 793, 357 P.2d 1049]; *Adkins* v. *Brett,* 184 Cal. 252, 258 [193 P. 251]; Witkin, Cal. Evidence (2d ed.) § 1295.)

Recent decisions have attempted to curtail reliance upon the fictitious notion which invites a jury to consider evidence for one purpose and shun it for another. (*Bruton* v. *United States,* 391 U.S. 123, 129-131 [20 L.Ed.2d 476, 481-482, 88 S.Ct. 1620]; *People* v. *Aranda,* 63 Cal.2d 518, 519 [47 Cal. Rptr. 353, 407 P.2d 265]; *People* v. *Chambers,* 231 Cal.App.2d 23, 33 [41 Cal.Rptr. 551]; see note, 82 Harv. L.Rev. at p. 477.) The *Johnson* rule, admitting the witness's prior statement to impeach his credibility but not as substantive evidence against the accused, promotes resort to the fiction. Unless the prosecu-

---

[5] Cf. *People* v. *Johnson, supra,* 68 Cal.2d at p. 654, fn. 6; *People* v. *Gould,* 54 Cal.2d 621, 626 [7 Cal.Rptr. 273, 354 P.2d 865]; see McCormick, *The Turncoat Witness,* 25 Tex. L.Rev. 573, 577-582.

tion is to be deprived of the ability to prove prior inconsistent statements for impeachment—a deprivation hardly envisioned by the Sixth Amendment—the *Johnson* rule compels resort to limiting instructions, however questionable their efficacy. This dilemma was forecast in a footnote in *People* v. *Aranda, supra,* 63 Cal.2d at pages 529-530, warning that such holdings cast doubt ''on any rule that purports to cure an encroachment on the right to confrontation by an instruction to the jury to disregard inadmissible hearsay evidence.''

By an accident of time, the problem of a limiting instruction does not arise here. Since this was a pre-*Johnson* trial, the defense could not be expected to make an objection, let alone be held to a demand for a limiting instruction. The extrajudicial statements to the officers came to the jury with no limitation whatever, no direction to exclude them from consideration as evidence of guilt. An assumption that the jury considered this evidence only to measure credibility would be unrealistic. The defense witnesses' prior statements tended to prove not only that these witnesses had lied, but that the two children had indeed occupied the bedroom of defendant; that the latter had possessed the physical ability to engage in sexual intercourse; that he had lied on the witness stand and forced his lies upon the rest of the family out of consciousness of guilt. The jury's reception of this substantive evidence of guilt created constitutional error, which requires reversal unless the reviewing court can disaffirm a reasonable possibility that it substantially influenced the verdict. (*People* v. *Johnson, supra,* 68 Cal.2d at pp. 660-661; *People* v. *Hopper, supra,* 268 Cal.App.2d at p. 778.) Although the other evidence of guilt was strong, so was the inculpatory impact of the extrajudicial statements. There is a reasonable possibility that the latter contributed substantially to the verdict; thus reversal must follow.

Other errors occurred. Called as a defense witness, Ruda Pierce denied knowledge of improper sexual activity by her husband, stating that neither L nor N had complained of molestation. Over defense objections, the prosecutor was permitted to elicit on cross-examination her denial of statements to the investigators that defendant had frequently beaten her, as well as testimony regarding the trigger pull of the pistol which had caused her wound the night of November 6. She testified that the trigger pull was ''not really hard.'' Later defendant testified that the pistol had fired accidentally after his wife had cleaned it and was handing it to him. On rebut-

tal the prosecutor called a ballistic expert to the stand. Over objection the expert identified the pistol and testified that its firing required a 12-pound pull when the hammer was uncocked, a 4-pound pull when it was cocked.

Although the trial court had discretion to permit impeachment on collateral matters extracted on cross-examination, admission of the expert's testimony represented an abuse of discretion. The implication that defendant had deliberately shot his wife had a potential for prejudice which far outstripped its probative bearing on questions of guilt and credibility. (Evid. Code, § 352.)

On cross-examination by defense counsel N, the elder sister of the complaining witnesses, admitted that she held defendant responsible for shooting her mother, since the gun was his. On redirect examination the prosecutor asked N if there was any other reason why she held him responsible. The trial court overruled a defense objection, permitting N to testify that defendant had almost killed her mother on other occasions by beating her until she was unable to stand. The ruling was error. Once a witness has admitted bias, the court should not permit his rehabilitation by inquiry into the causes by which he justifies his bias. (*People* v. *Zemavasky,* 20 Cal.2d 56, 63-64 [123 P.2d 478].) Under the Evidence Code the rule is probably addressed to the trial court's discretion. (Evid. Code, § 352.) Its wisdom is demonstrated in the present case. As it turned out, the witness's answer had a prejudice-arousing quality, while its probative value was minimal.

Without any record of objection in the trial court, defendant claims denial of speedy trial. In lieu of a record, he pursues the inacceptable technique of attaching an affidavit to his brief, charging that he was kept in the county hospital for 30 days after his arrest, questioned repeatedly and not provided an opportunity to communicate with an attorney. Matters outside the record will not be considered on appeal, nor will an affidavit attached to the appeal brief fill gaps in the record. (*People* v. *Shaffer,* 182 Cal.App.2d 39, 45-46 [5 Cal. Rptr. 844].) Failure to bring an accused properly before a magistrate is reversible error only if it impaired fairness of his trial. (*People* v. *Stroble,* 36 Cal.2d 615, 626 [226 P.2d 330].) Defendant shows no unfairness from the alleged delay.

There are other claims of error which need not be discussed. Some of them are meritless, some made for the first time on appeal and others which need not arise on retrial.

Judgment reversed.

Pierce, P. J., concurred.

REGAN, J.—I concur in the result and do so for the reason that the trial court failed to give the instruction limiting the jury's use of the questioned testimony for the purpose of impeachment.

I agree that *People* v. *Johnson,* 68 Cal.2d 646 [68 Cal.Rptr. 599, 441 P.2d 111], holds that in criminal trials section 1235 of the Evidence Code cannot be constitutionally invoked for the purpose of permitting a witness' prior inconsistent statement as *substantive* evidence against the accused; that substantive use of such a statement may deprive the accused of his Sixth Amendment right to confront and cross-examine the witness as delineated in *Douglas, Pointer* and *Bridges.*

In *Johnson* the prosecution introduced the sworn testimony of its witnesses before the grand jury as substantive evidence in the criminal trial. In its opinion in *Johnson* the court emphasized that these statements constituted the *sole evidence* that an act of intercourse had taken place as charged. In applying the test laid down in *Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824], the court then concluded that the People had not proved that the *substantive* use of the prior inconsistent statements was harmless beyond a reasonable doubt.

In the case before us the prosecution had rested its case, and the defense had then offered testimony by its witnesses to establish the innocence of defendant, when the prosecution called two police officers as rebuttal witnesses for the purpose of impeachment to show prior inconsistent statements made to the police officers were admissible for the purpose of impeachment. It was evidence admitted when the right to confront these witnesses who allegedly made the statements was afforded, to wit, when the trial was in progress. The Sixth Amendment protections guaranteed by the United States Constitution were at all times present during the trial in providing the requirements of confrontation and cross-examination.

The United States Supreme Court announced the confrontation rule in criminal trials in three celebrated cases. I call attention to the factual situation in each.

In *Bridges* v. *Wixon,* 326 U.S. 135, 151 [89 L.Ed. 2103, 2113, 65 S.Ct. 1443], we note that in this administrative hearing the prior inconsistent statements of a government witness were admitted not for the purposes of impeachment but as

substantive evidence, and the court then states (at p. 153 [89 L.Ed. at p. 2115]) : "The statements which O'Neil (the government witness) allegedly made were hearsay. We may assume they would be admissible for purposes of impeachment. But they certainly would not be admissible in any criminal case as substantive evidence." The court laid great stress on the fact that the prior statements of O'Neil were "unsworn statements."

In *Pointer* v. *Texas,* 380 U.S. 400 [13 L.Ed.2d 923, 85 S.Ct. 1065], the Supreme Court in holding that the Sixth Amendment's guarantee of confrontation and cross-examination was denied, pointed out (at pp. 406-407 [13 L.Ed.2d at pp. 927-928]) that "a major reason underlying the constitutional confrontation rule is to give a defendant charged with a crime an opportunity to cross-examine the witnesses against him," and concluded that because a transcript of statements amounting to a confession by a codefendant of the petitioner, which had been taken at a preliminary examination before a magistrate where the codefendants appeared without counsel *was read into the record in the absence of the maker of the statements* from the trial, "its introduction in a federal court in a criminal case against Pointer would have amounted to denial of the privilege of confrontation guaranteed by the Sixth Amendment." (P. 407 [13 L.Ed.2d at p. 928].) Unlike the case before us, the maker of the statements was not available at the trial for cross-examination.

In *Douglas* v. *Alabama,* 380 U.S. 415 [13 L.Ed.2d 934, 85 S.Ct. 1074], the petitioner and a codefendant Loyd were tried separately. Loyd was found guilty. At petitioner's trial Loyd was called as a witness *by the state.* The state then produced a confession signed by Loyd and under guise of cross-examination to refresh Loyd's recollection read from the document in its entirety. The document was not offered in evidence. The court states (at p. 418 [13 L.Ed.2d at p. 937]) : "We decide today that the Confrontation Clause of the Sixth Amendment is applicable to the States. *Pointer* v. *Texas, ante* p. 923. . . . In the circumstances of this case, petitioner's inability to cross-examine Loyd as to the alleged confession plainly denied him the right of cross-examination secured by the Confrontation Clause. Loyd's alleged statement that the petitioner fired the shotgun *constituted* the only direct evidence that he had done so . . . a crucial link in the proof of both petitioner's act and of the requisite intent to murder." (Italics added.)

I am in agreement with the holding in *People* v. *Alvarez,*

268 Cal.App.2d 297, 299 [73 Cal.Rptr. 753]. The court in considering the contention that the admission into evidence of extrajudicial prior inconsistent statements of an appellant by an extension of the holding of the court in *People* v. *Johnson, supra,* 68 Cal.2d 646, was error, states (at pp. 299, 303): "If the testimony was admitted for impeachment purposes only, the *Johnson* rules could not apply to the case at bench. The court in *Johnson* was careful to point out at page 658: 'The United States Supreme Court has squarely stated that extrajudicial statements of a witness, *while admissible for impeachment purposes,* "certainly would not be admissible in any criminal case as substantive evidence. . . ." ' (Italics added.) The court points out at page 660 that when prior inconsistent statements are introduced for their traditional purpose of impeaching a witness, this may have little effect on the guilt determining process. The court went on to state: ' [T]he erroneous admission of such a statement as substantive evidence does not automatically deprive the defendant of a fair trial, and the conviction will be reversed only in those cases in which prejudice ensued.'

". . . . . . . . . . . . .

"Even before enactment of the Evidence Code a witness' prior inconsistent statement could be used to discredit his testimony given at the trial. (*People* v. *Orcalles,* 32 Cal.2d 562, 572-573 [197 P.2d 26] ; *People* v. *Ballard,* 218 Cal.App.2d 295, 309 [32 Cal.Rptr. 233].) The case of *People* v. *Johnson, supra,* 68 Cal.2d 646, did not alter that rule. . . ." (See also, 82 Harv.L.Rev. p. 472.)

The orderly investigation and prosecution of criminal cases I believe requires the result as expressed herein.

Under the facts in the case before us, there was immediate in-court confrontation of the witnesses. The prior extrajudicial statements are admissible for impeachment purposes when the limiting instruction is given.

On February 18, 1969, the opinion was modified to read as printed above. Respondent's petition for a hearing by the Supreme Court was denied March 26, 1969.