[Crim. No. 4797. Second Dist., Div. One. Oct. 27, 1952.]

THE PEOPLE, Respondent, v. NELLIE A. RAMIREZ, Appellant.

Umann & Bubrick, Sam Bubrick and Harry M. Umann for Appellant.

Edmund G. Brown, Attorney General, and Stanford D. Herlick, Deputy Attorney General, for Respondent.

DORAN, J.—This is an appeal from the judgment.

The sole contention on appeal is that, ''The defendant's rights were substantially prejudiced by the comments of the trial judge in the presence of the jury.''

Defendant was adjudged guilty by a jury of selling a preparation of heroin in violation of section 11500 of the Health and Safety Code.

The facts and trial errors, as they appear in the reporter's transcript, are as follows: A state narcotic enforcement officer, Mr. O'Connor, and an investigator from the district attorney's office were checking an area known as

Hicks Camp in El Monte. Both officers were in plain clothes and using a county car. "They observed one Leiva near the intersection" of two streets and stopped the car. O'Connor testified, quoting from the reporter's transcript:

"Q. Now, at that time that you met Leiva, did you have a conversation with him relative to narcotics? A. Yes, sir, I did.

"Q. What was said, and by whom?

"MR. UMANN: To which we object, your Honor, no proper foundation having been laid, defendant not being present, hearsay.

"THE COURT: You dropped your voice there when you said 'defendant,' I didn't hear it.

"MR. UMANN: Sir?

"THE COURT: You dropped your voice when you said 'defendant.'

"MR. UMANN: Defendant not being present, your Honor.

"THE COURT: I don't know of any rule that requires defendant to be present at a conversation in order to make it admissible.

"MR. UMANN: Conversation as to this defendant between the officer and a third party?

"THE COURT: The conversation may be admissible, although defendant isn't present.

"MR. UMANN: There is no conversation with this defendant.

"THE COURT: Not offering to prove a conversation with the defendant, offering to prove a conversation with the witness Leiva.

"MR. UMANN: Your Honor, that would be hearsay as to this defendant."

The ruling was error but resulted in no prejudice for Leiva later testified the same as the officer. O'Connor testified further:

"A. I observed Mr. Leiva on the street. We stopped the vehicle we were in, and I asked him, Mr. Leiva, if he knew the whereabouts of a Reuben Cruz, and he shook his head, indicating no. He walked over to the car. I then told Mr. Leiva that I had met Mr. Cruz earlier in that area and that I had purchased some marijuana from him, and I asked him if he knew the whereabouts of Mr. Cruz's partner; and he stated that he did not, but that there was some narcotics in that area, stated that 'You will find it around here.' I then asked him what else was in the area, and he stated that there was some 'cardigan' around."

"Cardigan" means heroin. Eliminating other details of the conversation for the sake of brevity, O'Connor continued, "I then asked Mr. Leiva if he wanted to go over and see if this party was home. He stated he was on his way home, but that he would take us over there. He entered the back of the vehicle, seated himself in the back seat, and we drove to the defendant's home."

They then drove to defendant's home which was about five miles from where the officers met Leiva. O'Connor gave Leiva three five-dollar bills and a ten. The officers had the numbers of the bills for identification. The arrangement between Leiva and the officer was that Leiva was to purchase heroin from the defendant. Officer O'Connor continued, referring to Leiva, "He got out of the vehicle and walked down a dirt alley to this link wire fence which he indicated. He opened the rear gate and stepped inside, and then I saw him walk around the left side of the house towards the front. He was getting out of my direct sight, so I asked Investigator Walker to turn the car around headed in the other direction, in the same direction Mr. Leiva was walking in. I then got out of the car and walked in the direction of the rear gate. At approximately 50 or 60 feet from the fence, I saw Mr. Leiva return from the front of the house, still inside the wire fencing, but walking between the fence and the house, walk back to the rear gate, come out; I then walked over to Mr. Walker, joined him, and we were joined by Mr. Leiva, who again entered the rear seat." Leiva returned with the heroin and was immediately placed under arrest. The officers then went to defendant's home. Defendant meanwhile had gone to the store with her two children to buy some candy. Returning in fifteen or twenty minutes the officers placed defendant under arrest. The home was searched but no narcotics found. Defendant had a five-dollar bill which was one that had been given to Leiva. The rest of the money was never found either on Leiva or the defendant or at the store visited by defendant.

On cross-examination, Officer O'Connor testified in part about defendant's arrest:

"Q. And she denied that she had any narcotics, didn't she? A. Yes, she did.

"Q. And she denied that she made any sale to anybody, didn't she? A. That is correct, yes, sir.

"Q. And you told her that she gave Leiva the exhibit, the bindle, and she said, 'You did not see me give it to him,'

isn't that true? A. I told the defendant that I saw her give Leiva the exhibit, and I also told her that the other officer saw her give him the exhibit.

"Q. Actually that wasn't true, was it? A. That is true.

"Q. True—true, that you were lying? A. I did not see her —I told her I did, but I did not.

"Q. I see. And she says, 'You did not see me,' is that right? A. She asked me when, and I told her when she went in the front door of the house, and she says, 'No, you didn't.' "

Leiva who, as noted above, testified for the prosecution, was taken to defendant's house at the time of the arrest. Officer O'Connor testified as follows with relation to this incident:

"Q. Did you ever tell Leiva, 'Don't take the blame for this beef, it's hers,' or words to that effect? Did you ever say anything like that? A. Not words to that effect. I did make a statement to Mr. Leiva, though.

"Q. Oh, you did make a statement to him? A. Yes, sir, I did.

"Q. Did you tell him not to take the blame for this? A. I said, 'You have got no business taking the blame for what she did.'

"Q. When did that conversation take place? A. Before I brought Mr. Leiva to the defendant's home.

"Q. Yet you arrested him at the same time, didn't you? A. I arrested him before that, yes, sir.

"Q. You arrested him, and you didn't release him yet? A. That is correct, yes, sir.

"Q. Even though you made the statement that he shouldn't take the blame, you still booked him and recommended $25.00 bail, didn't you? A. I didn't recommend any bail at all.

"Q. All right, you still booked him? A. I booked him, yes, sir."

Leiva was taken to defendant's home at the time of the arrest and with relation to this incident Officer O'Connor testified:

"A. I asked the defendant if this was the person she knew as Cuero, and she stated that it was, and that she had received $5.00 from him earlier that evening and had given him five $1.00 bills in change for that. Mr. Leiva then explained, 'They saw everything, there is no sense of denying it.' And the defendant stated, 'They did not see me give it to you.' "

Leiva also testified:

"Q. How come you went along with the officers on this deal to buy some heroin for them, in other words, why did you

agree to act as go-between? A. Just figure I was probably making something, I would make something out of it."

The officers denied any prearrangement with Leiva relating to the defendant's arrest or Leiva's testimony.

The record reveals that Leiva was an ex-convict; had been convicted of selling marijuana and had served a term therefor in the penitentiary and was on parole at all times herein mentioned.

The record also reveals that a complaint was also filed against Leiva at the same time the complaint in the within action was filed. Leiva was held to answer, and the information filed; the trial was set for a week or so after the trial of the defendant herein. At the trial of the within action efforts were made by the defense to show that concessions were made by the prosecution in consideration for Leiva's testimony against defendant herein. For example, Leiva's bail was reduced and in that connection defendant's counsel, referring to that occasion, inquired of Leiva:

"Q. Did you make the following statement at that time, when your bail was raised in Department 41, October 15, 1951, to the Court, after your bail was raised, 'Your Honor, but I wish I could—the District Attorney's office is the one that tried to help me out because they got the facts on this case. The facts are—I guess I shouldn't—is it right for me to talk about the case now?'

"Q. Did you make that statement in court? A. I can't say that I did."

Further cross-examination on the subject finally brought out the answer:

"A. It could have been, but I mean I don't see it right here, could have been I did; I can't remember exactly."

The defendant testified and denied the sale and with relation to the incident testified as follows:

"DIRECT EXAMINATION

"By MR. UMANN:

"Q. Nellie, have you ever been convicted of any offense before?

"MR. BRESLIN: I object.

"THE COURT: Objection sustained. You can't impeach your own witness when she hasn't even testified yet.

"MR. UMANN: I'm not trying to impeach her, sir.

"THE COURT: That's an impeaching question. If it's intended to prove character, there's only one way of proving character, and that's by general reputation.

"Q. By MR. UMANN: Where do you live? A. I live at 702 East Mission Drive, San Gabriel, California.

"Q. Whom do you live there with? A. By myself.

"Q. You have some children, have you? A. I have two small children.

"Q. And, Mrs. Ramirez, on the 19th, I believe it is, of September, do you remember that occasion when you were arrested? A. Yes, sir.

"Q. Now, just prior to the time you were arrested, did you see the witness, Leiva, before you were arrested that day? A. Yes.

"Q. Now, about what time was it? A. Well, I couldn't tell you at the present, but I know that it was getting after supper time. I was looking out of the back window, and I seen Mr. Leiva—I seen somebody out in the back yard, and I thought it was the rag man so I went through the front door, through the right hand side, and he was there. Then he said, 'Hello, Nellie.' I says, 'Hello.' Then he hesitated a minute, and he says, 'Could you change me a $5.00 bill?' I says, 'I haven't got the money, but if you come inside I'll give it to you.' Then he came inside through the right-hand side, and I gave him five ones, and then he told me, 'Is Johnnie still mad at me.' I told him, 'No, he's not.' Then he says, 'All right.' Then he left through the front door to my right-hand side."

Referring to the empty capsules which the officers found in the house defendant testified as follows:

"Q. All right, now, you saw the package there with the medicinal capsules? A. Yes, sir.

"Q. That was introduced here? A. Yes, sir.

"Q. And the officer said that he found them in the lamp, in the top of the lamp? A. Yes, sir.

"Q. About how high is that lamp? A. Oh, medium height.

"Q. Well, how high would you say medium was? Was it an ordinary floor lamp? A. Yes, sir.

"Q. Now, did you put them there? A. Yes, I did.

"Q. Why did you put them there? A. Because earlier in the day I had given my daughter a capsule. She doesn't like to drink aspirins in the form of an aspirin so I smashed it and put it in a capsule.

"Q. All right, and then what did you do? A. I gave it to her, and I left it on the table. Then my little boy was playing

with them so I took it away from him, and I put it in the lamp shade.

"Q. That was permanently or temporarily? A. No, just temporary. It was close by me.. I was cleaning the house."

The foregoing constitutes the evidence against the defendant at the conclusion of the trial when the court adjourned until the next day for the arguments.

The next morning the record discloses the following:

"MR. BRESLIN: At this time, may the Court please, in the light of something that developed last night after the Court recessed, the People move to reopen the case at this time so that the jury can have the benefit of new evidence.

"MR. UMANN: May we approach the bench, your Honor?

"THE COURT: Yes."

(Whereupon, the following proceedings were had at the bench, outside the hearing of the jury.)

"MR. UMANN: It is my understanding, your Honor, that a matter may be reopened after argument for new evidence, or evidence that diligent search failed to——

"THE COURT: Or newly discovered evidence.

"MR. UMANN: Or newly discovered evidence. It is my contention, your Honor, that this is not newly discovered evidence.

"THE COURT: I don't think you know what the facts of the situation are. For the purpose of the record, what actually happened yesterday when the defendant testified——

"MR. UMANN: If your Honor please, I will request the Court to keep the voice down.

"THE COURT: When the defendant testified that she had these capsules to use for the purpose of giving aspirin to her daughter, who didn't like to take aspirin in its regular form, and that she crushed an aspirin tablet and put it in these capsules whenever there was an occasion for giving aspirin to the child, I immediately realized that there was something rather doubtful about that testimony because of the size of the capsule, and because of the size of an aspirin tablet; so I took an aspirin tablet and crushed it and also got the exhibit, the capsules, and it is quite obvious that it would take at least five capsules to hold a crushed up aspirin tablet. In dumping the capsules out of the box, we observed, Mr. Breslin was there, we observed that two of those capsules had been used and contained a small quantity of a whitish powder.

"MR. UMANN: But, your Honor, my point is——

"THE COURT: Wait a minute, let me finish the statement.

"MR. UMANN: All right.

"THE COURT: I then thought it was of extreme importance to determine what that whitish powder was, in view of the fact that the defendant has thoroughly tied herself up with these capsules. I felt that if it were aspirin that was in the capsule, that it would corroborate the defendant; on the other hand, that it might be something else. So I directed the clerk, and I authorized him to turn over the capsules to Jay A. Allen, the police department chemist, with a request from me that he make an analysis of the contents to determine what the white powder in the capsules was. Mr. Allen came over this morning, and the capsules were delivered to him, and he made an analysis, and finds that the contents of the capsules is heroin, a fact which was wholly unknown up until this morning.

"MR. UMANN: Well, your Honor, I believe that the testimony shows that I asked that question direct of Inspector O'Connor, and he stated there was no narcotics there.

"THE COURT: Yes, but he didn't know.

"MR. UMANN: My point is, this is not new evidence. I referred to the capsules specifically.

"THE COURT: You didn't ask him whether he examined the contents of the empty capsules.

"MR. UMANN: I asked him if he examined them. He said he found some capsules.

"THE COURT: The answer to that proposition, we have had them here in the court room, we have all handled them— that is, you have handled them, Frank Breslin has handled them, and the officers handled them—and nobody discovered there was this white powder inside of the capsules until we dumped the capsules out. The reason the white powder was not visible was that the bottom of the box was white and the small amount of powder in the capsules didn't show up until they were put on a dark surface.

"MR. UMANN: I will also say this, your Honor, I understood the capsules were in the possession of the clerk of the Court until the court had made an order.

"THE COURT: Yes.

"MR. UMANN: Then I understand further that it was Mr. Breslin who obtained the capsules and brought them in to you before any order was issued.

"THE COURT: Right.

"MR. UMANN: Well, I just made the record.

"THE COURT: They were brought in at my request, I wanted to look at them.

"MR. UMANN: I say, before the order was issued, he had examined them, after the case had closed for the day.

"THE COURT: Oh yes, it wasn't until we took our recess at the end of the day, after he had finished his argument, that I had an opportunity to look at those capsules."

(Whereupon, proceedings were resumed before the jury.)

"THE COURT: In the case on trial, permission is granted the District Attorney to reopen the case for the introduction of further testimony which has come to his attention since our taking our recess at 4:00 o'clock, yesterday.

"MR. BRESLIN: Thank you, your Honor."

The chemist for the Los Angeles Police Department then testified that the test of the powder in two of the capsules showed that they had contained heroin. One of the jurors inquired:

"JUROR #9: If you had've saved this chemical that you had on the spot plate, I believe you called it, after you made your test, if you had taken that and turn it over to another chemist, could he have then taken it and still found heroin in the solution?"

The answer was, "No." During the examination of the witness by another juror the trial judge volunteered the information, "As far as we know, during the course of the trial, nobody opened any capsules here."

The action of the court above noted was prejudicial error. All proceedings in connection therewith were secret. Defendant was not notified and thus given an opportunity to object to such action or to participate therein. Defendant was also denied the right to have another chemist present when the test was made. Also it was prejudicial for the court to remark or, in effect testify, that the capsules had not been opened during the course of the trial.

The defense was more or less apologetic. For example, at one point during the trial which, incidentally lasted three days, defendant's counsel commented, "I appreciate the Court's cooperation, and I am sure the Court understands the tenor in which I have requested the statement. I would like to state to the jury, if I may digress for a moment, that Judge Fricke was both my teacher and I was a student of his; and I am the last one to infer that anything improper was

done. I don't mean to infer that at all." And another example:

■ "Mr. Umann: May I complete my statement, your Honor? I do not mean that you have failed in your duty, I am not insinuating that, your Honor. It is just difficult because of—I don't mean to infer that—well, let's put it this way, your Honor, I want to object to your leading the witness and pulling him out of a hole every time; because this man is on cross-examination, the very veracity of his statements is at stake here, and this Court has—and may the record so show—interrupted the testimony and led the witness as to what he means; and I believe that that is improper, your Honor, and I say, with the utmost respect for this court——"

The reference to the trial judge's conduct is supported by the record not only once but numerous times; the objection was warranted although delayed. Incidentally, it is the function and duty of the district attorney to conduct the prosecution and the defendant's attorney the defense.

The prosecution rested at the end of the first day of the trial. On the morning of the second day a most unusual incident occurred involving not only the trial judge but defendant's counsel. At the cost of brevity, as recited in the reporter's transcript, it is as follows:

"The Court: Let the record show the jury, counsel and the defendant present.

"Mr. Umann: At this time, your Honor, we ask the Court to—we will ask the District Attorney to stipulate to a statement, that if you were called as a witness you would testify——

"Mr. Breslin: That if you were called as a witness?

"Mr. Umann: If the Judge were called as a witness, he would testify as to certain proceedings.

"The Court: I think without doing that I can state as to what the facts actually were.

"Mr. Umann: I will ask the Court at this time to make a statement to the jury as to certain proceedings held in the court room, and in chambers, as you have indicated.

"The Court: Yes. Ladies and gentlemen of the jury, this morning after the probation calendar had finished a suggestion was made by Mr. Breslin, and the Public Defender representing Mr. Leiva, the witness who testified here, that his case in which he is charged with selling narcotics be advanced to this date and be tried. There was a suggestion originating with the remark that I made to the effect that if Mr. Martin the Public Defender had come into court and moved to dismiss

the Leiva case, I would feel obligated as a matter of law to dismiss it, because under the law Mr. Leiva is not guilty of selling narcotics. The discussion which followed, in which Mr. Martin, Mr. Breslin, and I participated, resulted in the conclusion that since under the evidence Mr. Leiva was not guilty, that to leave the case with a mere dismissal would leave a record in the police department, or the records where criminal records are kept, indicating that he had been charged with the sale of narcotics but the case had been dismissed, leaving it open to explanation as to why it had been dismissed, and not showing upon its face that the reason for his dismissal was that he was not guilty, counsel then stipulated that the case might be tried by the Court without a jury and the Court decide the case upon the testimony which had been received upon this particular trial. Upon which I found Mr. Leiva not guilty.

"MR. UMANN: Now, I will further ask the Court if it is correct that at the time, it was suggested at first that the matter be dismissed so that something may be over his head in case he got in trouble again?

"THE COURT: There was no such suggestion, Mr. Umann. The dismissal was first mentioned by me when I made the statement that under the evidence as I heard it here, and which of course would be substantially identical with the testimony if Mr. Leiva actually went to trial and Mr. Martin made a dismissal upon the basis of the testimony as I have heard it here, I would feel obligated to dismiss the case, because this evidence fails to show Mr. Leiva guilty of violating the narcotic law.

"MR. UMANN: Well, then, your Honor——

"THE COURT: In other words, the objection to the dismissal came from counsel.

"MR. UMANN: It was your suggestion at first, and he objected to it, is that right?

"A. I didn't—— I said if Mr. Martin made a motion, I would grant it.

"MR. UMANN: The discussion was they could file over later, is that right?

"THE COURT: Yes.

"MR. UMANN: May the Court further include in that statement that I was not present during this conference.

"THE COURT: That is correct, you had left the court room to go to some other court.

"MR. UMANN: I appreciate the Court's cooperation, and I am sure the Court understands the tenor in which I have requested the statement. I would like to state to the jury, if I may digress for a moment, that Judge Fricke was both my teacher and I was a student of his; and I am the last one to infer that anything improper was done. I don't mean to infer that at all."

Thus the principal witness for the prosecution, Mr. Leiva the ex-convict on parole, was completely exonerated and, to use a common expression, given a clean bill of health. The obvious prejudicial effect of the incident requires no comment. On the other hand the defendant, the mother of two children, was, as above noted, denied the right to answer the first question on direct examination, to wit: "Q. Nellie, have you ever been convicted of any offense before?"

Later in the trial during the cross-examination of Leiva the trial judge remarked, "Objection sustained; furthermore, there is nothing to indicate what relation that has to this case. While the defendant is charged with the sale, I don't see how Leiva could ever be charged with a sale." And again when the People's witness O'Connor was recalled for further cross-examination the court sustained an objection with the remark, in part ". . . as I have already indicated, in my opinion the defendant Leiva did not violate the narcotic law at all."

The sole contention on appeal is that, "The defendant's rights were substantially prejudiced by the comments of the trial judge in the presence of the jury." That appellant's contention is supported by the record there can be no question. ██ It is well settled law, indeed elementary, as stated by the court in *People* v. *Conboy*, 15 Cal.App. 97 [113 P. 703], that "it is of the highest importance in the administration of justice that the court should never invade the province of the jury; should give them no intimation as to its opinion upon the facts; but should leave them wholly unbiased by any such intimation to ascertain the facts for themselves." The principle is well stated in *Sharp* v. *State*, 51 Ark. 147 [10 S.W. 228, 14 Am.St.Rep. 27], wherein the court states that, "The judge has the right, in a criminal prosecution, to interrogate the witnesses. But he has no right to usurp the place of the state's attorney, 'and prescribe the order of introduction of the witnesses, and become active in their examination'; nor has he the right to assume the duties resting on the prisoner's

counsel in the general conduct of the defense. He may ask questions which the attorneys had the right to propound, and failed to ask, when the answers to the same may tend to prove the guilt or innocence of the accused. It would be a reproach to the laws of the state if he was required to sit and see the guilty escape, or the innocent suffer, through a failure of parties or their attorneys to ask a witness a necessary question. *State* v. *Lee,* 80 N.C. 483; 1 Whart. Ev., sec. 496.

"In all trials the judge should preside with impartiality. In jury trials especially, he ought to be cautious and circumspect in his language and conduct before the jury. He should not express or intimate an opinion as to the credibility of a witness, or as to controverted facts; for the jury are the sole judges of facts, and the credibility of witnesses."

*People* v. *Cole, ante,* p. 253 at p. 261 [248 P.2d 141], contains the following on the same subject:

"By his unjustified finding of contempt; by the statement to the defendant: 'You will prove nothing'; by the entire discussion before the jury which is quoted above the judge not only seriously discredited the defendant in the jury's eyes but threw his judicial weight onto the side of the prosecution in the presence of the jury by at least implicitly vouching for the credibilty of the prosecution's witness.

"Our courts have on many occasions pointed out the duty of a trial judge before a jury, both in criminal and civil cases, not to do anything which would lead the jury to believe that the judge was of the opinion that one party or the other should receive the verdict, nor to appear to throw his judicial weight on one side or the other." (Citing cases.) "These cases reiterate the fact that jurors are eager to find and quick to follow any supposed hint of the judge as to how they should decide the case."

Section 1111 of the Penal Code provides that, "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

■ Assuming that the appellant was guilty of the offense charged, it appears from the record, both as a matter of fact and as a matter of law, that the witness Leiva was an accomplice and yet the word accomplice was not mentioned during the trial.

In the circumstances it was the court's duty to fully instruct on the law relating to the testimony of an accomplice.

■ As stated in *People* v. *Putnam,* 20 Cal.2d 885 at 890 [129 P.2d 367], "It is incumbent upon a court in a criminal case to instruct the jury of its own motion, charging them fully and fairly upon the law relating to the facts of the case. (Citing cases.) ■ The court is not relieved of the duty to give instructions whose necessity is 'developed through the evidence introduced at the trial.' (*People* v. *Warren, supra* [16 Cal.2d 103 (104 P.2d 1024)].) ■ An instruction is necessary if it is vital to a proper consideration of the evidence by the jury. (*People* v. *Warren, supra; People* v. *Tapia, supra* [131 Cal. 647 (63 P. 1001)]; *People* v. *Heddens,* 12 Cal.App.2d 245 [55 P.2d 230].) Accordingly, it has been held that the court must of its own motion instruct the jury in criminal cases with respect to accomplices and their testimony." (See, also, *People* v. *Heddens,* 12 Cal.App.2d 245 [55 P.2d 230]; *People* v. *Hubbell,* 54 Cal.App.2d 49 at 68 [128 P.2d 579]; and *People* v. *Katcher,* 97 Cal.App.2d 209 [217 P.2d 757].)

The judgment is reversed and the cause remanded for a new trial.

White, P. J., and Drapeau, J., concurred.

A petition for a rehearing was denied November 7, 1952, and respondent's petition for a hearing by the Supreme Court was denied November 25, 1952.