[Crim. No. 5530. Third Dist. Sept. 18, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHNNY PIERCE, SR., Defendant and Appellant.

## COUNSEL

Daniel B. Lorenz, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Arnold O. Overoye and Michael Franchetti, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**REGAN, J.**—After a trial by jury, defendant was found guilty of a violation of section 288 of the Penal Code[1] (lewd and lascivious conduct). He appeals from the judgment of conviction.

[1]This is the second trial for defendant. This court reversed the first judgment of guilty mainly upon the holding in *People* v. *Johnson* (1968) 68 Cal.2d 646 [68 Cal.Rptr. 599, 441 P.2d 111] (use of prior inconsistent statements without limiting instruction). (*People* v. *Pierce* (1969) 269 Cal.App.2d 193 [75 Cal.Rptr. 257].) *Johnson* was subsequently disapproved by the United States Supreme Court in *California* v. *Green,* 399 U.S. 149 [26 L.Ed.2d 489, 90 S.Ct. 1930].

L, defendant's 13-year-old stepdaughter, testified that on the night of November 6, 1966, defendant forced her into sexual relations both with him and L's brother T, age 10. Both children testified that on that night defendant had sexual relations with L and forced her into acts of oral copulation with him and T. The children complied with defendant's demands because of fear for their own safety and the safety of other members of the family. L testified that she had engaged in sexual acts with defendant since she was about 10 years old. T had been so engaged in this behavior, at defendant's demands, for about a year.

L stated that she had complained of defendant's conduct to her mother and other family members; however, nothing was done to stop defendant's activity. L testified that she had not engaged in sexual intercourse with persons other than her brother and defendant. She denied having made up stories about sexual acts with other persons.

N, L's 20-year-old sister, and no longer living at home, testified that defendant had indulged in sexual relations, including oral activity, with her for several years. When N told defendant he would have to stop, defendant replied, "Well, there was always a younger sister, that he wouldn't miss me much." The acts occurred during the years 1962 through 1964, and the conduct testified to by N was very similar to the conduct testified to by L.

Other family members testified that defendant not only had the opportunity to molest L, but also that she had complained to them.

A report by a Dr. Din, after a physical examination, indicated that L had a marital introitus (vagina), consistent with that of a person who had had intercourse on multiple occasions.

The defense is best summarized by this court's statement in *People* v. *Pierce* (1969) 269 Cal.App.2d 193, 197-198 [75 Cal.Rptr. 257]:[2] "The trial theory of the defense was twofold: (1) Defendant was bedridden because of a spinal operation approximately five weeks earlier, had a heavily taped back, had to use a bedpan and was physically incapable of being the active partner in sexual intercourse. (2) Although defendant had in his room the hospital bed which he occupied and the double bed ordinarily occupied by his wife, he was alone in his room on the night of the offense, the double bed was empty and both L and T slept in their own room with some of Art Pierce's children. [Brother of defendant.] An orthopedic surgeon confirmed the back operation and expressed the opinion that sexual intercourse would

[2]The defense covers approximately 350 pages of transcript. The trial theory of defense is identical with that of the first trial (as quoted above). The testimony on retrial is repetitious and cumulative and no purpose will be served by setting it forth in detail.

have caused back pain and muscle spasm. Defendant denied sexual activities with L, T, and their elder sister and testified that the two children had not occupied the bed in his room on the night in question.

"According to their testimony Art and his wife remained up all night. One of them would enter defendant's bedroom from time to time during the night to see if he needed anything and each time found him alone. There were two bedrooms in the house, one occupied ordinarily by defendant and Ruda [defendant's wife], the other occupied by the children. There was a connecting bathroom between the two bedrooms."[3]

On rebuttal, the following testimony was given by the investigating police officers: When called to the house on another matter, the police found defendant out of bed and moving around the house. Defendant became irate that the officers were confiscating his weapons.

By way of impeachment Lt. Stark of the Sacramento Police Department testified that on November 11, 1966, he interviewed Artis and Carrie Pierce. They had told him that on the night of November 6, 1966, defendant had been in a rage over the removal of his guns. They told him that defendant had thrown a knife at his mother, and had threatened the entire family. They told him that defendant was moving around the house on that night.

Lt. Stark also testified that he talked with A (the daughter of Artis and Carrie) who had told him that on the night of November 6, 1966, she was in defendant's room where he had exposed himself and tried to induce her into sexual acts. She also told Lt. Stark of the knife incident.

On November 19, Lt. Stark had spoken with Ruda Pierce. She told him that L had complained to her about defendant's conduct toward her, and that she threatened to call the police and report defendant. She said that defendant talked her out of such a course of conduct.

Officer Cracraft, Sacramento Police Department, testified that she was present at the conversation between Lt. Stark and A, and that A made the statements testified to by Lt. Stark.

▇ Defendant contends the trial judge abused his discretion and committed reversible error in refusing to admit psychiatric evidence regarding the complaining witness.

During the time preceding the trial, L was in the custody of her mother, Ruda. Without seeking a court order, defendant's counsel arranged for a psychiatric examination of L. L was taken to the psychiatrist by her mother, who later became the first witness for the defense. L had not been consulted about the examination; she was not informed of its existence or purpose

---

[3]Ruda Pierce, L's natural mother, testified that L had a bad reputation for honesty.

until she was brought in. The examination had apparently been forced on L and she did not want to cooperate during the examination. She preferred not to discuss the particular conduct involved, nor to demonstrate such with any doll or mannequin. Prior to the examination, the psychiatrist had obtained L's "personal history" from a letter written by defendant's counsel. The letter indicated that L may have made up the story, had a bad reputation for truth and honesty, and may have had illicit relations with other boys. The witness stated that his opinion was based both upon his observation of L and upon the history he had obtained from the letter. The district attorney was not informed of the examination until after its completion, whereupon he was sent a copy of the psychiatrist's report. After extensive direct and *voir dire* examination, the court refused to admit psychiatric evidence based on this examination.

Defendant emphasizes the impressive credentials of the examining psychiatrist, and argues that he could adequately fulfill the test set forth in *People* v. *Russel* (1968) 69 Cal.2d 187, 196 [70 Cal.Rptr. 210, 443 P.2d 794], i.e., "to inform the jury of the effect of a certain medical condition upon the ability of the witness to tell the truth" rather than to himself decide. The defendant also contends that there was no valid reason why the court rejected the psychiatrist's testimony, and that the conduct of the trial judge indicated a marked bias.[4]

The People contend that the failure by defendant to request that the trial court order a psychiatric examination of L necessitates the rejection of this appeal from the trial court's ruling. Secondly, they argue the court did not abuse its discretion since the evidence offered did not tend to show her credibility, the evidence could not be effectively communicated to the jury, and, the examination was not reliable.

The trial court has the authority to order a psychiatric examination of a witness in cases involving sex violations. In *Ballard* v. *Superior Court* (1966) 64 Cal.2d 159, 171-177 [49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416], the court held that the admissibility of psychiatric evidence

---

[4]During *voir dire* of the psychiatrist outside the presence of the jury, the trial judge inquired of the witness whether he was familiar with the law on this particular subject, and he replied that he was not. The trial judge then read to the witness part of a recent decision of our Supreme Court. (*People* v. *Russel, supra,* 69 Cal.2d at p. 197.) The judge then made the following comments: "You appeared in this Court on a previous occasion, and I reached a conclusion at that time that your conduct was reprehensible and I questioned at that time whether I should ever permit you to sit in this Court again. And that is what I am concerned about now. I still have that feeling of apprehension about you, Dr. F., based on your conduct in that case, and I still have the feeling that you should not be permitted to testify in courts of law, in spite of your training and background. You understand your function and purpose now in this matter?"

as to the mental and emotional condition of a complaining witness for the purposes of impeaching her credibility is a matter to be determined by the trial court through the exercise of sound legal discretion.

In *Ballard, supra,* the court states (at pp. 175-176): "We do not mean to suggest that psychiatric testimony of the mental and emotional condition of the prosecutrix must necessarily be admitted in every case. We recognize that psychiatric evaluation is not absolute but only relatively illuminating; its utility in the ascertainment of the prosecutrix' condition must depend upon its posture in the whole picture presented to the trial court. That court can properly determine in its discretion whether psychiatric testimony as to the mental and emotional condition of the complaining witness should be admitted. . . ." and further, "We submit however, that a general rule requiring a psychiatric examination of complaining witnesses in every sex case or, as an alternative, in any such case that rests upon the uncorroborated testimony of the complaining witness would, in many instances, not be necessary or appropriate. Moreover, victims of sex crimes might be deterred by such an absolute requirement from disclosing such offenses.

"Rather than formulate a fixed rule in this matter we believe that discretion should repose in the trial judge to order a psychiatric examination of the complaining witness in a case involving a sex violation if the defendant presents a compelling reason for such an examination. The Supreme Court of South Dakota recently stated, 'In an article entitled Psychiatric Opinions as to Credibility of Witnesses: A Suggested Approach, in Vol. 48, Cal.L.Rev. 648, at page 663, this conclusion is reached: "Most of the courts which have dealt with this problem have recognized the authority of the trial judge to order a psychiatric examination of a witness on the question of credibility. The principle established by the majority of the cases is that the judge has the *discretion* to order such an examination, although the failure to do so has rarely been held an abuse of discretion." We are not aware of any good reason why that should not be the rule concerning complaining witnesses in sex offenses.' "

The court then concluded: "We therefore believe that the trial judge should be authorized to order the prosecutrix to submit to a psychiatric examination if the circumstances indicate a necessity for an examination. Such necessity would generally arise only if little or no corroboration supported the charge and if the defense raised the issue of the effect of the complaining witness' mental or emotional condition upon her veracity. Thus, in rejecting the polar extremes of an absolute prohibition and an absolute requirement that the prosecutrix submit to a psychiatric examination, we have accepted a middle ground placing the matter in the discretion of the trial judge." (*Id.* at pp. 176-177.)

In *People* v. *Russel, supra,* 69 Cal.2d at pages 195-196, the court states: "In our *Ballard* opinion we set forth in a footnote . . . some of the 'dangers' involved in the use of psychiatric evidence to impeach credibility. As we there suggested, each of the considerations indicated is a factor to be weighed by the court at some point in the course of its overall determinations relative to the production and admission of such evidence. It must be observed, however, that some of these factors pertain for the most part to determinations undertaken at the time of passing upon the motion for examination, while some are peculiarly relevant to determinations undertaken when the products of an ordered examination are sought to be introduced into evidence.

"When the court passes upon a motion for psychiatric examination of the complaining witness, the question before it is whether, in light of the totality of circumstances revealed, it is necessary or proper that psychiatric knowledge in general be utilized in order to aid the trier of fact in its assessment of credibility. This decision must rest for the most part on the court's judgment as to whether an emotional or mental condition is involved which a body of laymen either would be unable to detect or would be unable to relate in terms of effect to the matter of credibility. (See generally, McCormick, Evidence (1954) § 13, pp. 28-29; 7 Wigmore, Evidence (3d ed. 1940) § 1918, pp. 10-14; Juviler, *Psychiatric Opinions as to Credibility of Witnesses: A Suggested Approach* (1960) 48 Cal.L.Rev. 648, 660-661.)

"When such an examination *has* been ordered by the court, however, and evidence based upon it is sought to be introduced, the court must address itself to considerations dealing with the specific evidence offered."

A set of standards has been established by holdings in *Ballard* and *Russel,* by which a trial judge may make a determination that psychiatric testimony may be adduced to make a jury aware of a witness' mental or emotional condition and its effect upon his testimony. This set of standards requires the defendant to move the trial court to order a psychiatric examination of a complaining witness in a case involving a sex violation. The trial court if presented with a compelling reason for such examination shall order that it be made.

In the instant case, the trial judge was deprived of exercising his discretion on the first aspect, and thus had no opportunity to set guidelines or exercise controls over the examination. That the trial judge in this case would have imposed controls is clear from the record.

It is clear to this court that the trial court did not abuse its discretion in rejecting the testimony of the psychiatrist. As noted before, the witness underwent extensive *voir dire* by both counsel and the trial court. There is

ample reasoning in the record which underlies the trial court's decision to reject the evidence on the psychiatric examination and clearly shows the basis of its discretionary determination. The testimony of the witness as to whether or not he could give evidence on credibility was contradictory. His overall testimony was somewhat vague and confusing. The examination itself was not conducted under free objective conditions. (See *Ballard* v. *Superior Court, supra,* 64 Cal.2d at p. 177.) The record is not entirely clear as to whether the tendency of the evidence would have been to decide rather than inform. Under the principles set forth in *Russel, supra,* and from our review of the record, we are of the opinion that the trial court did not abuse its discretion. In so reaching this conclusion, we also take note that L's testimony was corroborated by her brother T. (See *Ballard* v. *Superior Court, supra,* 64 Cal.2d at pp. 171, 177.)

 Defendant contends that an examination of the defense witness Cassie Johnson by the court was reversible error, for the trial judge thus assumed the role of prosecutor. (See *People* v. *Ramirez* (1952) 113 Cal. App.2d 842, 854-855 [249 P.2d 307].)

Mrs. Johnson had testified on direct that on one occasion she had seen L under a bridge engaging in what appeared to be sexual activities with several boys. Her testimony indicated that she observed this activity briefly and then left. Mrs. Johnson testified that she had seen L go into a deserted house with boys and men. She also had overheard L say that she would do anything to get away from home.

At the conclusion of the direct examination, the trial court briefly examined Mrs. Johnson. The questions asked by the court concerned the length of time she had known L, whether or not she had tried to stop the alleged conduct under the bridge, whether or not she reported the incident to L's parents or the authorities, and her opinion of the seriousness of L's conduct. No objection was made to these questions posed by the court.

 The trial judge has the duty to control all proceedings during the trial with a view to the expeditious and effective ascertainment of the truth regarding the matters involved. (Pen. Code, § 1044.) To this end he may examine witnesses to elicit or clarify testimony. (*People* v. *Rigney* (1961) 55 Cal.2d 236, 241 [10 Cal.Rptr. 625, 359 P.2d 23, 98 A.L.R.2d 186]; *People* v. *Corrigan* (1957) 48 Cal.2d 551, 555 [310 P.2d 953].) The mere fact that a judge examines a witness at some length does not establish misconduct, nor does the fact that the testimony elicited by the judge's questions would probably have been elicited by counsel. (*People* v. *Rigney, supra,* 55 Cal.2d at pp. 243-244.) We see no indication here that the trial judge, in examining Mrs. Johnson, aligned himself with the prosecutor in the minds of the jury. (*Id.* at pp. 241-242.) And it is equally well

settled that a judge's examination of a witness may not be assigned as error on appeal where no objection was made when the questioning occurred, for otherwise a party could speculate on the verdict by deliberately failing to call the court's attention to a matter which could be remedied at trial. (*People* v. *Corrigan, supra,* 48 Cal.2d at p. 556.) ■■ After a review of the record, we are convinced that the questions were proper and no error occurred. (See *People* v. *Bonville* (1968) 268 Cal.App.2d 107, 116 [73 Cal. Rptr. 741]; see also *People* v. *Bowman* (1966) 240 Cal.App.2d 358, 382-383 [49 Cal.Rptr. 772].)

■■ Defendant contends that the admission into evidence of testimony by L's older sister, N, pertaining to sexual relations between the older sister and defendant was improper because it was evidence of a crime different from that for which defendant was being tried. Defendant notes that an objection was raised below in the instant case whereas no objection was raised at the first trial. The argument has no merit.

■■ It is settled that evidence of other crimes is ordinarily admissible where it tends to show presence of a common design, plan, or modus operandi, and this rule applies to sex offenses committed with persons other than the prosecuting witness where the offenses are not too remote, are similar to the offense charged, and are committed with persons similar to the prosecuting witness. (*People* v. *Cramer* (1967) 67 Cal.2d 126, 129 [60 Cal.Rptr. 230, 429 P.2d 582]; *People* v. *Kelley* (1967) 66 Cal.2d 232 [57 Cal.Rptr. 363, 424 P.2d 947]; *People* v. *Covert* (1967) 249 Cal.App.2d 81 [57 Cal. Rptr. 220].) ■■ A review of the record shows that these requisites were met and the evidence properly admitted.

Furthermore, even though no objection was raised at the first trial, this court recognized that N's testimony was admissible. (See *People* v. *Pierce, supra,* 269 Cal.App.2d 193.) Thus, under the doctrine of the law of the case (see *People* v. *Chapman* (1968) 261 Cal.App.2d 149, 160 [67 Cal.Rptr. 601]; 3 Witkin, Cal. Procedure (1954) Appeal, § 210, p. 2419), it was also admissible here pursuant to the decision on the former appeal.

■■ Defendant contends that certain questions asked of him on cross-examination were improper in that it was an attempt upon the part of the prosecutor to impeach defendant with alleged statements made by other defense witnesses. In other words, defendant argues that error was committed in allowing the prosecution, in cross-examination of the defendant, to lay a foundation of inconsistent statements, and to question defendant as to inflammatory conduct and acts that allegedly took place where the only evidence the prosecution had for impeaching the defendant was the police officers' testimony (on rebuttal) of prior inconsistent statements of *other*

*defense witnesses.* This appears to be a somewhat oblique attempt to bring this case within the rule laid down in *People* v. *Johnson* (1968) 68 Cal.2d 646 [68 Cal.Rptr. 599, 441 P.2d 111]. (See Evid. Code, § 1235.) However, this is not the *Johnson*-type situation, and in passing, we note that no *Johnson*-type error occurred here as to the recanting witnesses, for the jury was properly admonished that evidence of prior inconsistent statements was not received for the purpose of proving the truth of what then was said, but only for the limited purpose of testing the credibility (i.e., impeachment) of the witness. (See *People* v. *Pierce, supra,* 269 Cal.App.2d at pp. 203-204.)

Implicit in this argument, however, is the contention that certain questions asked of defendant were improper in that they suggested to the jury the existence of prejudicial facts which could not be proven by the prosecution, and thus were asked in bad faith.[5]

We think the questions regarding the knife incident, the threats, and the alleged conversations with Ruda were improper. (See *People* v. *Ney* (1965) 238 Cal.App.2d 785, 796 [48 Cal.Rptr. 265] (and cases cited therein).) We conclude, however, that their inclusion in the trial was harmless error. First of all, as noted above, the court admonished the jury that the questions were

---

[5]In particular, defendant complains of the following questions asked on cross-examination:

"Q. I'll restate the question to you. Did you chase your mother out of the house that night? A. No.

"Q. The night of November the 6th? A. No.

"Q. Did you throw a knife at her that night?

"A. I didn't even own any knives. No is the answer.

"Q. Would you look at the photograph marked People's Exhibit Number Four, Mr. Pierce? See that mark in the center of that doorway, that door? Do you see that?

"A. Yes, I see where you've got the circle around it.

"Q. Yes. Do you recognize that as being a mark that was on the front door of your house on Elder Creek Road?

"A. There were marks all over the doors; in fact, holes that went clear through them.

" . . . . . . . . . . . . . .

"Q. Did you throw a knife in that door right at that exact spot on November the 6th? A. No.

" . . . . . . . . . . . . . .

"THE COURT: I might remind the jury again, however, that the questions are not evidence. Keep that in mind, ladies and gentlemen, as I suggested before, that they may be considered only as they throw light upon the answer. So the mere fact that counsel asked the questions is not even a suggestion that the incident occurred.

"MR. TAYLOR: Q. Now, Mr. Pierce, did you threaten anybody in the house that night, November the 6th?

"A. No. In fact, I never threatened anyone at any other time in my household.

" . . . . . . . . . . . . . .

"Q. Did your wife Ruda ever say that she was going to the police department about you molesting L . . . ? A. No.

"Q. Did you ever try to talk her out of going to the police department about L . . . ? A. No, I never even—"

not evidence. The court earlier had given the jury the same admonition. Secondly, the evidence was not so closely balanced as to present grave doubts as to defendant's guilt. Without reviewing in detail all of the evidence, it is clear that the case against defendant was based upon the corroborated evidence of both L and T. The modus operandi was corroborated by N. Several defense witnesses were effectively impeached. Under the circumstances, we think no prejudicial error occurred. (Cf. *People* v. *Ney, supra,* 238 Cal.App. 2d at p. 798.)

The judgment is affirmed.

Friedman, Acting P. J., and Janes, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 10, 1970.