Filed 3/27/14  P. v. Aguirre CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>CESAR AGUIRRE,<br><br>  Defendant and Appellant. | A136522<br><br><br><br>(Alameda County<br>Super. Ct. No. C168733) |

Appellant Cesar Aguirre was placed on felony probation after a jury convicted him of vandalism causing more than $400 in damage, based on the destruction of plate glass windows during an Occupy Oakland demonstration.  (Pen. Code, § 594, subds. (a), (b)(1).)  He contends the judgment must be reversed because the trial court engaged in judicial misconduct by questioning witnesses in a manner suggesting bias in favor of the prosecution.  He also challenges the court's imposition of probation investigation and probation supervision fees, noting the order was made without an express determination of his ability to pay.  We affirm.

BACKGROUND

On the night of November 2-3, 2011, Frank Ogawa Plaza in downtown Oakland was the site of a protest by members of the "Occupy" movement.  About 300-400 people were in the plaza.  Officer Tedesco of the Oakland Police Department was part of a tactical team assisting "skirmish lines" of other officers set up in response to the protests

1

and the attendant vandalism and violence. At about 1:00 a.m., Tedesco and his team were inside a multilevel parking garage near the plaza that they had entered to look for protesters.

From his vantage point on either the third or fourth level of the parking structure's stairwell, Tedesco could see the police department's Internal Affairs Division (IAD) and recruiting office, which were located about 70 yards away on the plaza. The glass on the lower floor windows and doors on that building had been boarded up from the inside, a routine precaution taken during protests in the plaza to prevent entry into the offices. Although it was dark, that area of the plaza was illuminated by streetlights and lights that were on in the upper floors of the building.

Tedesco noticed appellant walking by himself from the inside of the plaza toward the IAD and recruiting office, carrying a red folding chair. He was wearing a black, long-sleeved hoodie with red and black flannel inside the hood, black jeans, a white dust mask, black glasses that appeared to be goggles, and a black backpack with what looked like an orange stripe on one side. Suspicious, Tedesco called out appellant's description to the other officers in his squad. He saw appellant swing the chair several times into the windows of the IAD/recruiting offices, shattering the glass and sending glass shards flying through the air. Appellant dropped the chair and started pushing against one of the boarded-up doors, but was unable to enter the building.

Appellant moved away from the IAD/recruiting offices and joined a crowd of people near the fountain, leaving the folding chair behind. Another protester picked up the red chair and put it in the fountain, and it was ultimately retrieved by the police. Tedesco and his team began walking down the stairs toward the skirmish line below, with Tedesco keeping his eyes on appellant as best he could. When they came out of the parking structure, Tedesco saw appellant sitting in a group of about five people, wearing the same attire as before but not carrying the chair. Tedesco told his supervisor appellant was the person who had broken the windows and the supervisor summoned an arrest team. Tedesco did not participate in the arrest himself because he was carrying a shotgun with "beanbags" and "wouldn't put hands on anyone."

Appellant was handcuffed by Officer Pulsipher, after which Tedesco advised Pulsipher he had the right person. Pulsipher recalled that appellant was wearing a black or blue beanie cap, a black zip-up sweater, and a dark color backpack with orange or red. Pulsipher noticed small shards of glass on appellant's sleeves. A form prepared by the property unit of the police department indicated that the personal property taken from appellant for safekeeping when he was booked into custody included what was described as a black "saddle bag," swimming goggles, and a knife and tools. It did not mention a dust mask. According to Sheilah Boothby, the property unit supervisor, items listed on this form did not include property that an investigator determined had evidentiary value.

The defense took the position that Tedesco's identification of appellant was unreliable given the darkness of the plaza, the number of other people present, the confusion of events during the protest, and the presence of trees in front of the IAD/recruiting offices, which would have obscured Tedesco's view.

DISCUSSION

I. Judicial Misconduct

Appellant contends the judgment must be reversed because the court "took on the role of a second prosecutor" by asking its own questions of witnesses. We disagree.

a. *Forfeiture*

"As a general rule, judicial misconduct claims are not preserved for appellate review if no objections were made on those grounds at trial." (*People v. Sturm* (2006) 37 Cal.4th 1218, 1237.) Appellant did not object to the conduct he now challenges, but invokes the rule that a claim will not be deemed forfeited when an objection and admonition could not cure the prejudice caused by the misconduct, or when objecting would have been futile. (*Ibid.*) Even if we were to conclude appellant's claims were properly before us, those claims fail on the merits.

b. *Judicial Misconduct—General Principles*

"A court commits misconduct if it persistently makes discourteous and disparaging remarks so as to discredit the defense or create the impression it is allying itself with the prosecution. [Citations.]" (*People v. Santana* (2000) 80 Cal.App.4th

3

1194, 1206-1207.) "The mere fact that a judge examines a witness at some length does not establish misconduct . . . ." (*People v. Pierce* (1970) 11 Cal.App.3d 313, 321.) "[I]t is not merely the right but the duty of the trial judge to see that the evidence is fully developed before the trier of fact and to assure that ambiguities and conflicts in the evidence are resolved insofar as possible." (*People v. Carlucci* (1979) 23 Cal.3d 249, 255 (*Carlucci*).) "A trial court has both the discretion and the duty to ask questions of witnesses, provided this is done in an effort to elicit material facts or to clarify confusing or unclear testimony." (*People v. Cook* (2006) 39 Cal.4th 566, 597; see also Pen. Code, § 1044 [judge has duty to "control all proceedings during the trial . . . with a view to the expeditious and effective ascertainment of the truth regarding the matters involved"]; Evid. Code, § 775 [court may call witnesses].)

   c. *Alleged Misconduct*

   The trial court allowed the jurors to submit questions to each of the witnesses, including Tedesco, Pulsipher and Boothby. The first alleged instance of judicial misconduct arises from the following exchange between the court and Tedesco while the court was asking questions submitted by jurors:

   "THE COURT: . . . One question that's posed is: The person that you saw with the red chair, did you happen to note whether the person was wearing any sort of gloves or anything on the hands?

   "[TEDESCO]: I don't recall seeing any gloves.

   "THE COURT: All right. You did get a look at [appellant] after he had been arrested; is that right?

   "[TEDESCO]: Yes.

   "THE COURT: Did you happen to note at that time whether he was wearing anything on his hands?

   "[TEDESCO]: I don't remember. I don't remember seeing any gloves.

   "THE COURT: When you did confirm for Officer Pulsipher, I think it was, that he had arrested the right person, how close would you say you got to [appellant]?

   "[TEDESCO]: I walked right by them. I was a few feet away.

4

"THE COURT: And did he have goggles on at that time?

"[TEDESCO]: He had on—I'm still not sure exactly if they're goggles or some type of individual eye piece—glasses. He did have those on.

"THE COURT: So he did have something on his eyes. Did he have the mask on? The dust mask?

"[TEDESCO]: Yes. When I saw him after Officer Pulsipher had arrested him, the dust mask was pulled down, and it was around his neck.

"THE COURT: And did he have the beanie on?

"[TEDESCO]: Yes, he had on a black beanie.

"THE COURT: All right. Earlier this morning, you identified [appellant] as a person you had seen, and you said that was the person who had the red chair. What did you base your identification of him in court on? Having seen him from up in the parking garage or having seen him up close or something else?

"[TEDESCO]: It's kind of a two-part answer. I—when I saw him from the parking garage, and I saw where he moved down to the—in the plaza, I made sure that he was still in the same spot. As I walked up to the skirmish line, I continued to look at him, and then I walked up directly alongside of him when the officer arrested him. So there were moments when I couldn't see him. People would pass by, or I was in and out of the garage going down the staircase, but I never lost sight of where he was at. I kept my eyes on him the entire time. So I based my identification on my total time looking at him.

"THE COURT: All right. Specifically, I was referring to identifying him here in court. You recognize his face from having seen it somewhere?

"[TEDESCO]: Yes, from that experience. From the—from this incident out on November 3rd.

"THE COURT: Including the time when he was arrested and you were standing nearby?

"[TEDESCO]: Yes, including that time.

5

"THE COURT: All right.  You've also testified that there was sort of what appeared to you to be a V shaped orange stripe on one side of the backpack that he wore; is that right?

"[TEDESCO]: Yes.

"THE COURT: Which side of the backpack, if you're able to tell us, was the orange stripe?

"[TEDESCO]: I believe it was on the left.  The left side of the backpack.

"THE COURT: Okay.  Was he still in possession of that backpack at the time he was arrested?

"[TEDESCO]: Yes, he was wearing it.

"THE COURT: Did you participate in—this isn't a very good word to use, but I can't think of another one right now.  Did you participate in the handling of [appellant] after he had been arrested?  In other words, if he was taken somewhere, were you one of the officers who took him somewhere?

"[TEDESCO]: No, I walked up alongside of him as the other officers arrested him. The skirmish line continued pas[t] him further into the plaza.  I followed behind the skirmish line, continuing into the plaza.  Later, as I left the area, I walked by Pulsipher, Officer Pulsipher, and told him, again, 'You have the right person.  That's the right person.'  I didn't have any contact with [appellant].  I didn't talk to him.

"THE COURT: So, did you participate at all in the disposition of anything that he was wearing?

"[TEDESCO]: No."

Appellant also claims the court committed misconduct with respect to its questioning of Pulsipher.  After counsel for both sides had finished examining Pulsipher, two jurors submitted written questions and the following exchange occurred:

"THE COURT: . . . At the time you arrested [appellant], . . . did he have any sort of mask on his person?

"[PULSIPHER]: There was no mask covering his face.  I don't remember if he had something pulled down around his neck, but not that I remember.

6

"THE COURT: All right. Did you write any kind of report in connection with this?

"[PULSIPHER]: Yes, I did.

"THE COURT: In that report, do you think perhaps you described what [appellant] had on?

"[PULSIPHER]: There is a brief description of what he was wearing, yes.

"THE COURT: Do you think it might help refresh your memory if you take a look at it?

"[PULSIPHER]: Yes, it would.

"THE COURT: Do you have it with you?

"[PULSIPHER]: I do.

"THE COURT: Any objection?

"[DEFENSE COUNSEL]: No.

"THE COURT: Why don't you do that. You looked at your report?

"[PULSIPHER]: Yes, I did.

"THE COURT: Did you see anything there that refreshes your recollection one way or another?

"[PULSIPHER]: Not about the—having a bandan[n]a or a beanie on, but at the time it was dark and being at several of the protests, I know several of the protesters pull it up, or they keep it down around their neck. He had it zipped up, so I wasn't able to see what he was wearing underneath that.

"THE COURT: Did you ever remove the hoodie from him?

"[PULSIPHER]: No, I didn't."

The court indicated it would not ask Pulsipher a question asked by another juror, but would allow counsel to follow up on that question. The prosecutor took the opportunity to question Pulsipher about a photograph taken of appellant on the night of the arrest, after which defense counsel indicated he had no further questions of the witness. The court then asked the jurors whether they had additional questions of Pulsipher and one juror submitted a note. The court again questioned Pulsipher:

7

"THE COURT: . . . Okay. You mentioned that the backpack that was worn by [appellant], you had said orange or red marking on it?

"[PULSIPHER]: Yeah.

"THE COURT: Can you give us any further description of that marking?

"[PULSIPHER]: I believe they were kind of maybe an inch or two inches in width, and they ran vertically with the backpack. Other than that, no. I just know they were very contrast to the black color of the backpack.

"THE COURT: So the backpack is black, and the marking red or orange, it was a vertical sort of stripe of some kind?

"[PULSIPHER]: Yeah.

"THE COURT: Can you tell us anything else about that stripe? Its shape, you said maybe a couple inches or so wide. Anything else you could tell us about it?

"[PULSIPHER]: No, nothing else comes to mind.

"THE COURT: Did you happen to pay close attention to it?

"[PULSIPHER]: No, there were so many people being arrested at that time. We would arrest somebody, fill out the paperwork, and they were supposed to get back on line.

"THE COURT: All right. Do you happen to remember, particularly since you reviewed your report and the description of him you wrote, do you happen to remember whether he was wearing any sort of eye wear, whether it be glasses or anything else over the eyes?

"[PULSIPHER]: I don't remember him wearing any when I made contact with him.

"THE COURT: Okay. Any follow-up?

"[PROSECUTION]: No.

"THE COURT: [Defense counsel]?

"[DEFENSE COUNSEL]: No."

The final instances of misconduct cited by appellant occurred during the testimony of Boothby, who testified about the procedure for safekeeping the personal property of

8

persons who were arrested. The prosecutor asked Boothby about a form, marked as People's Exhibit 11, which appeared to catalogue appellant's property at the time of his arrest, and she responded: "It actually has a box just below center that has check boxes that tell you when to use the form. So it's for safekeeping personal property and also firearms that are taken during a domestic violence call, and firearms taken during mental health incidents. And lastly, suspected stolen property. So that's property that we take. And then we provide receipts and such to give it back." The court then asked: "So if somebody is arrested and booked into the police department jail, is this the form that's used to keep the record of the personal property they had on them that was subject to your safekeeping?" Boothby answered that some items might stay at the jail and be identified on a different form, but any objects that came to her unit would be identified on a form like the one used in People's Exhibit 11.

After the prosecutor asked some additional questions about the form, the court asked Boothby a series of questions whose answers laid the foundation for admission of the form as a business record: that it was a record kept in the ordinary course of business and filled out by police department employees; that the document was a copy of a record for a particular person in custody; that the person in this case was identified as "Aguirre, Cesar"; that it was dated November 3; and that the person who filled out the form was a civilian employee of the police department.

In response to a written question submitted by a juror after both sides had finished their examination, Boothby testified she would not necessarily expect an item like a dust mask (which was not listed on Exhibit 11) to be individually listed on the form unless it had evidentiary value. Defense counsel followed up with a question about who decides the evidentiary value of an item, and Boothby testified the investigators on a case did so. The court sustained as calling for speculation defense counsel's question as to whether it would be safe to say the items on Exhibit 11 had no evidentiary value. When defense counsel had some difficulty rephrasing the question, the court had the following exchange with Boothby:

9

"THE COURT: Did you testify earlier that what goes on this record, this record does not include property that somebody has determined has evidentiary value?

"[BOOTHBY]: That is correct.

"THE COURT: Who—and somebody else besides you and your people make that determination, right?

"[BOOTHBY]: Correct.

"THE COURT: That's going to be some police officer who makes that determination; is that right?

"[BOOTHBY]: Yes, yes.

"THE COURT: All right. And do you generally know who that police officer is if they're making a decision about property that you're not getting? The answer should be no to that, right?

"[BOOTHBY]: Before it comes to me?

"THE COURT: Right.

"[BOOTHBY]: And how it's decided, no.

"THE COURT: You have nothing to do with that?

"[BOOTHBY]: Right.

"THE COURT: Okay. I'm sorry. Go ahead.

"[DEFENSE COUNSEL]: No, that's quite all right.

"THE COURT: All right.

"[DEFENSE COUNSEL]: I think the record is clear on that point."

Later, the prosecutor asked Boothby on direct examination about how the high volume of arrests during the Occupy protests impacted the way the police department operated. The court sustained defense objections to two questions on the ground the questions called for speculation. The court briefly questioned Boothby about her knowledge of other police department units and indicated she would only answer questions about her unit. The prosecutor then elicited testimony that the property unit was over tasked by the high volume of property brought in for safekeeping during the protests.

10

d. <u>Analysis</u>

We begin by noting that many of the questions by "the court" that appellant cites as misconduct were actually questions submitted by the jurors that were read by the court. The jury would have drawn no inference about the court's view of the evidence from these questions. Appellant raises no challenge to the procedure used to allow juror questions, nor could he reasonably do so. (See *People v. Majors* (1998) 18 Cal.4th 385, 406-407; *People v. Cummings* (1993) 4 Cal.4th 1233, 1305-1306 [court may ask questions submitted by the jurors or allow counsel to ask such questions].)

To the extent that some of the questioning originated with the court and not the jurors, there is no support in the record for appellant's claims of judicial misconduct. The court was evenhanded in its approach and sought to elicit relevant evidence that would not necessarily favor one side or the other. It was never disparaging of defense counsel and, indeed, assisted counsel in eliciting testimony on one occasion.

Appellant argues the court showed bias in favor of the prosecution when it asked Tedesco how close he was to appellant when he confirmed to Pulsipher he "had arrested the right person." This choice of language could not be reasonably interpreted to signal that the court (as opposed to Tedesco) thought appellant was "the right person."

Similarly unavailing is appellant's claim that the court's questions to Pulsipher regarding the dust mask "clearly indicated to the jurors where its sympathy resided." The court was relaying a question by a juror who was obviously interested in learning whether Pulsipher had seen appellant wearing a disposable dust mask such as that described by Tedesco. In allowing Pulsipher to refresh his recollection by referring to his report regarding the arrest, the court was simply attempting (unsuccessfully) to get a more meaningful response to this question than Pulsipher's initial answer that he did not remember whether appellant had a mask. It is not misconduct for a court to clarify or cover omissions in a witness's testimony. (*Carlucci*, *supra*, 23 Cal.3d at p. 256.)

Appellant also asserts the jurors would have inferred the court sided with the prosecution because it allowed the prosecutor to ask additional questions of Pulsipher after Pulsipher had answered questions by the jurors. We disagree, especially when it

11

was clear defense counsel also could have asked additional questions had he chosen to do so.

Nor do we agree the jury would have inferred judicial bias when the court asked Boothby the questions necessary to lay a foundation for the property form admitted as Exhibit 11. This form was as beneficial to the defense as the prosecution because it did not list a dust mask among the personal property taken for safekeeping at the time of appellant's arrest, and described a "black saddle bag" rather than the black backpack with an orange or red stripe that was described by Tedesco and Pulsipher. There is nothing else about the court's exchanges with Boothby to suggest it favored the prosecution's position in any way.

We also note that any possible inference the jury might have drawn about the court's views of the case was mitigated by the following instruction: "It is not my role to tell you what your verdict should be. Do not take anything I said or did during the trial as an indication of what I think about the facts, the witnesses, or what your verdict should be." We assume the jury followed this instruction and conclude it is not reasonably probable the jury would have reached a different result had the court refrained from asking any questions. (*People v. Harris* (2005) 37 Cal.4th 310, 350-351.)

II. Ability to Pay Fees

The probation report recommended that appellant pay a probation investigation fee of $710 and a $90 per month probation supervision fee under Penal Code section 1203.1b. The report further stated, "[Appellant] has been advised of the amount(s) and of the right to have a Court hearing with counsel concerning their ability to pay, pursuant to Section 1203.1b of the Penal Code." The court imposed a probation investigation fee of $250 and a probation supervision fee of $50 per month, with no objection by appellant.

Appellant argues the fees should be vacated because the court made no express determination of his ability to pay. The issue is forfeited because it was not raised in the trial court. (See *People v. McCullough* (2013) 56 Cal.4th 589, 597 [ability to pay booking fee is question of fact subject to forfeiture if not raised in trial court]; *People v. Snow* (2013) 219 Cal.App.4th 1148, 1150-1151 [defendant's challenge to probation

investigation and supervision fees based on ability to pay was forfeited where defendant had adequate notice of those costs and never objected or requested a hearing].)

DISPOSITION

The judgment is affirmed.[1]

_____

NEEDHAM, J.

We concur.

_____

SIMONS, Acting P.J.

_____

BRUINIERS, J.

---

[1]   Appellant has filed a separate petition for writ of habeas corpus arguing he is entitled to a new trial because the prosecution failed to disclose material and exculpatory evidence under *Brady v. Maryland* (1963) 373 U.S. 81, 87.  By separate order filed the same date as this opinion, we have issued an order to show cause returnable in the superior court.  (Case No. A139835.)